In re Adoption of Zschach.

[Cite as *In re Adoption of Zschach* (1996), 75 Ohio St.3d 648.]

(Nos. 94–2752 and 95–170—Submitted February 6, 1996—Decided June 6, 1996.)

*Squire, Sanders & Dempsey, David J. Young* and *Scott L. Marrah; Stebelton, Aranda & Snider* and *James C. Aranda,* for appellant Marylou Zschach.

*Wristen & Ucker* and *Ellen L. Wristen,* for appellee Nan Barnebey.

*Arthur H. Thomas, Jr.,* for appellee Stephen Johnson.

*James S. Albers,* urging reversal for *amicus curiae,* National Council for Adoption.

Cook, J.

I

This court has already determined that in order to contest an adoption, "a putative father who has signed the birth certificate of a child must file a written objection to the adoption with the court, Department of Human Services, or the agency having custody of the child[.]" *In re Adoption of Greer* (1994), 70 Ohio St.3d 293, 638 N.E.2d 999, paragraph three of the syllabus. In this case, we determine that a putative father's attempt to condition his consent to adoption upon his retention of permanent visitation rights is not the equivalent of a written objection as required under R.C. 3107.07(B).

Conjunctively, R.C. 3107.06(F)(3) and 3107.07(B) allow a court to enter a decree of adoption without a putative father's consent if he has failed to file a written objection to the adoption. In holding that Johnson's conditional consent was "tantamount to a written objection to the adoption," the appellate court necessarily determined that what is required to constitute an "objection" under R.C. 3107.07(B) is open to statutory interpretation. Even if we were to agree with the appellate court that such a statutory ambiguity exists, our analysis of the legislative purpose behind enactment of the adoption statutes leads us to conclude that nothing short of a written objection to the adoption proceeding suffices to preserve a putative father's right to contest an adoption.

In deciding the question before us today, it is important to recognize the competing policy considerations that the legislature attempts to balance through its enactment of the adoption statutes related to putative fathers. A putative father's right to a parental relationship with his offspring has been recognized by this court as well as the Supreme Court of the United States. See *Greer,* 70 Ohio St.3d at 298, 638 N.E.2d at 1003; *Lehr v. Robertson* (1983), 463 U.S. 248, 261–265,

103 S.Ct. 2985, 2993–2996, 77 L.Ed.2d 614, 626–629. The rationale for protecting the right of a putative father to have a parental relationship with his offspring is as follows:

"The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development." *Lehr* at 262, 103 S.Ct. at 2993, 77 L.Ed.2d at 627; *Greer* at 298, 638 N.E.2d at 1003–1004, fn. 2.

Ultimately, the goal of adoption statutes is to protect the best interests of children. In cases where adoption is necessary, this is best accomplished by providing the child with a permanent and stable home, see *In re Adoption of Ridenour* (1991), 61 Ohio St.3d 319, 328, 574 N.E.2d 1055, 1063, and ensuring that the adoption process is completed in an expeditious manner. See *In re Adoption of Baby Girl Hudnall* (1991), 71 Ohio App.3d 376, 380, 594 N.E.2d 45, 48. If these goals are met, the new parent-child relationship will have the best opportunity to develop fully.

In balancing the rights of a putative father and the state's interest in protecting the welfare of children, the legislature has enacted a statutory scheme where putative fathers are given the right to contest an adoption by filing an objection with the appropriate authority. In the absence of the objection required under R.C. 3107.07(B), a court lacks any indication of the putative father's full commitment to the responsibilities of parenthood. Where a putative father fails to demonstrate such a commitment, the state should not be compelled to listen to his opinion of where the child's best interests lie. See *Lehr* at 262, 103 S.Ct. at 2993–2994, 77 L.Ed.2d at 627.

Johnson urges this court to accept the appellate court's holding that his conditional consent to the adoption suffices as the objection required under R.C. 3107.07(B).[1] We cannot accept such a proposition. By attempting to preserve twenty hours of visitation rights per month, Johnson was, in effect, attempting to retain parental rights and privileges while agreeing to dispense with the attendant parental obligations and duties. Because the relationship that Johnson attempted to preserve in his conditional consent falls far short of the interest

---

1. Johnson additionally asserts that his motion for relief from judgment regarding the interlocutory order should be considered as a written objection under R.C. 3107.07(B). However, this too does not constitute an "objection" as contemplated in that statute.

protected under statute,[2] we cannot uphold the appellate court's finding.

While strict adherence to the procedural mandates of R.C. 3107.07(B) might appear unfair in a given case, the state's interest in facilitating the adoption of children and having the adoption proceeding completed expeditiously justifies such a rigid application. See *Lehr*, 463 U.S. at 265, 103 S.Ct. at 2995, 77 L.Ed.2d at 629.

## II

Johnson next argues that even if we find that his conditional consent does not constitute an objection to the adoption as required under R.C. 3107.07(B), we nevertheless should affirm the appellate court's decision because the proceedings conducted by the probate court denied him his due process rights. Specifically, Johnson argues that he was entitled to notice and a hearing prior to the probate court's finalization of the adoption that deprived him of a right to visitation.

R.C. 3107.15(A)(1) prohibits a court from granting visitation rights to a biological relative that survive a final decree of adoption. In *Ridenour, supra,* we commented upon the legislative purpose behind such a proscription as follows:

" * * * R.C. 3107.15 reflects the legislature's intent to find families for children. If preconditions are imposed on the adoptive parent-child relationship, or if adoptive parents are forced to agree to share parenting responsibilities with people whom they do not know, many potential adoptive parents will be deterred from adopting. Moreover, even where adoptive parents consent to visitation by biological relatives whom they do not know, such an arrangement is bound to be stressful for the child[.]" *Id.,* 61 Ohio St.3d at 328, 574 N.E.2d at 1063. Accordingly, Johnson cannot rely on Ohio's adoption statutes to demonstrate his right to notice and a hearing on issues of visitation surviving the final decree of adoption.

In determining whether the court's action with regard to Johnson constitutes an infringement of his due process rights, we must identify the nature of the private interest claimed by Johnson and determine whether that interest is

---

2. A court is without authority to incorporate visitation rights in favor of any biological relative into any final decree of adoption or an interlocutory order of adoption that has become final. Such prohibition is found in R.C. 3107.15(A)(1), which states:

"A final decree of adoption and an interlocutory order of adoption that has become final, issued by a court of this state, shall have the following effects as to all matters within the jurisdiction or before a court of this state:

"(1) Except with respect to a spouse of the petitioner and relatives of the spouse, to relieve the biological or other legal parents of the adopted person of all parental rights and responsibilities, and to terminate all legal relationships between the adopted person and his relatives, including his biological or other legal parents, so that the adopted person thereafter is a stranger to his former relatives[.]"

constitutionally protected. See *Lehr,* 463 U.S. at 256, 103 S.Ct. at 2990, 77 L.Ed.2d at 623. It is a well-established principle that the relationship between parent and child is a constitutionally protected liberty interest. *Quilloin v. Walcott* (1978), 434 U.S. 246, 255, 98 S.Ct. 549, 554, 54 L.Ed.2d 511, 519. As stated by the United States Supreme Court in *Lehr* at 257–258, 103 S.Ct. at 2991, 77 L.Ed.2d at 624, " 'the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.' '[S]tate intervention to terminate [such a] relationship * * * must be accomplished by procedures meeting the requisites of the Due Process Clause.' " (Citations omitted.) While these protections have been extended to biological fathers of children regardless of marital status, such protection is dependent upon the biological father's "full commitment to the responsibilities of parenthood[.]" *Id.* at 261, 103 S.Ct. at 2993, 77 L.Ed.2d at 626.

Accordingly, a potential parent-child relationship is accorded a degree of constitutional protection under the Due Process Clause; if a biological father comes forward and accepts the full responsibilities of parenthood, he will be extended full protection of that relationship under that clause. If the biological father fails to accept the responsibilities of parenthood, no continuing constitutionally protected interest will be recognized from the mere existence of a biological link.

Having delimited the precise nature of the constitutionally protected interest related to a potential parent-child relationship, we must determine whether that interest has been adequately protected.

"The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.' " *Mathews v. Eldridge* (1976), 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18, 32, quoting *Armstrong v. Manzo* (1965), 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62, 66. The question in our case then becomes whether Johnson was given adequate notice and opportunity to be heard with respect to his commitment to accepting parental responsibility for his child.

The procedures currently in place under Ohio law adequately protect a biological father's constitutionally protected right. If a biological father undertakes any of the actions set forth in R.C. 3107.06(F)(1) through (3), he may file an objection to the adoption, thereby making his consent necessary under R.C. 3107.06.[3] If such an objection is made, the court may enter a decree of adoption *only* upon finding, after proper notice and hearing, that (1) the putative father is

---

3. If a putative father has not undertaken any of the actions contemplated in R.C. 3107.06(F)(1) through (3), he may still take advantage of R.C. 3107.06(F)(4) to contest the adoption of his offspring.

not the father of the minor, or (2) that he has willfully abandoned or failed to care for and support the minor, or (3) that he abandoned the mother of the minor during pregnancy and up to the time of her surrender of the child or its placement in the home of the petitioner, whichever occurs first. R.C. 3107.07(B). If the objection is not made after proper notice, the putative father's consent becomes unnecessary. *Id.*

After placement of the child with Zschach on November 24, 1992, the probate court set a hearing on the adoption petition for December 24, 1992. The hearing was conducted and the court issued an interlocutory order of adoption. Johnson does not allege a notice deficiency with respect to the December 24 hearing. Nevertheless, Johnson failed to file a written objection to the adoption as required by R.C. 3107.07(B).

Because Johnson was afforded the opportunity to object to the adoption of his putative child pursuant to Ohio's adoption statute, but failed to so object and thereby demonstrate his full commitment to the responsibilities of parenthood, we find that Johnson's constitutionally protected interests were adequately safeguarded. Any interest asserted by Johnson regarding the preservation of visitation rights surviving the adoption does not invoke the protections of the Due Process Clause.

### III

Appellees also argue that other errors in the adoption proceeding rendered the trial court's final decree of adoption invalid and, thus, support the appellate court's judgment. These other alleged errors were adjudged moot by the appellate court in light of its finding that Johnson's conditional consent was tantamount to a written objection. Accordingly, we will pass upon these remaining issues.

### A

Johnson and Barnebey argue that the trial court erred in issuing a final decree of adoption because the initial placement of the child with Zschach without agency involvement or court approval was contrary to R.C. 5103.16[4] and obligat-

---

4. R.C. 5103.16 states in pertinent part:

"(A) Except as otherwise provided in this section, no child shall be placed or accepted for placement under any written or oral agreement or understanding that transfers or surrenders the legal rights, powers, or duties of the legal parent, parents, or guardian of the child into the temporary or permanent custody of any person * * * without the written consent of the department, or by a commitment of a juvenile court, or by a commitment of a probate court as provided in this section.* * * "

ed the court to dismiss the adoption petition pursuant to R.C. 3107.14(D).[5]

Neither Johnson nor Barnebey argues that the November 24, 1992 placement of the child with Zschach fell short of the procedural mandates contained in R.C. 5103.16. Rather, Johnson and Barnebey claim that their own act of "placing" the child with Zschach on October 17, 1992, and leaving the child in Zschach's primary care until the child was formally placed with Zschach by the court violates R.C. 5103.16. That statute prohibits the placement or acceptance of a child under an agreement that transfers the legal rights of parents to another without the written consent of the department of human services or commitment by a court. Johnson and Barnebey then point to R.C. 3107.14(D) for the proposition that the probate court was required to dismiss the adoption petition as a result of the "illegal placement."

While we have held that adoption statutes are in derogation of common law and therefore must be strictly construed, *Lemley v. Kaiser* (1983), 6 Ohio St.3d 258, 260, 6 OBR 324, 326–327, 452 N.E.2d 1304, 1307, strict construction does not require that we interpret statutes in such a manner that would mandate an unjust or unreasonable result. R.C. 1.47(C). Because the interests sought to be advanced by Barnebey and Johnson are not among those that are intended to fall within the protection of R.C. 5103.16,[6] we cannot adopt appellees' suggested statutory interpretation.

In the present case, both Barnebey and Johnson were active participants in the "illegal placement," which they now allege as grounds for dismissal of the adoption petition. In fact, Barnebey first contacted Zschach as "a friend" with respect to the placement of the child after she had engaged in unsuccessful negotiations to place the child with three sets of prospective adoptive parents. Furthermore, prior to formal placement by the court, neither challenged the petition on the grounds that the child had been living with Zschach for a month prior to the hearing.

---

5. R.C. 3107.14(D) states:
 "If the requirements for a decree under division (C) of this section have not been satisfied or the court vacates an interlocutory order of adoption, or if the court finds that a person sought to be adopted was placed in the home of the petitioner in violation of law, the court shall dismiss the petition and may determine the agency or person to have temporary or permanent custody of the person, which may include the agency or person that had custody prior to the filing of the petition or the petitioner[.]"

6. In placing their child for adoption in contravention of R.C. 5103.16, both Barnebey and Johnson could be subjected to fines and imprisonment. R.C. 5103.99(B) states:
 "Whoever violates section 5103.15, 5103.16, or 5103.17 of the Revised Code shall be fined not less than five hundred nor more than one thousand dollars or imprisoned not more than six months, or both."

R.C. 3107.14(D) is not intended to aid the remorseful biological parent in regaining custody of his or her child where that parent places the child in the home of a petitioner, consents to court placement of the child, and offers no objection while the court formally places the child for adoption in compliance with the procedural mandates of R.C. 5103.16. Instead, that portion of R.C. 3107.14(D) that mandates dismissal of a petition for placements made in violation of the law, together with R.C. 5103.16, is part of a legislative response to the perils of black-market transactions occasioned by the limited supply of and great demand for adoptable babies.

Because the best interest of children is likely to become a subordinate concern where profit-motivated parties become involved in adoptive placement, the legislature enacted R.C. 5103.16 to ensure proper agency or court supervision of private placements. By penalizing parties engaged in such illegal activity and providing the courts with authority to nullify adoptive placements that are neither conducted by an authorized agency nor judicially approved, the legislature has provided probate courts with the tools to deter future violations and to rectify illegal placements injurious to the improperly placed child.

None of these concerns is reflected in appellees' desire to have the adoption petition dismissed.

## B

Barnebey additionally argues that the adoption petition should have been dismissed due to the probate court's failure to finalize the interlocutory order within one year of its issuance. In support of her argument, Barnebey cites R.C. 3107.14(C), which states in pertinent part:

"If, at the conclusion of the hearing, the court finds that the required consents have been obtained or excused and that the adoption is in the best interest of the person sought to be adopted, it may issue * * * a final decree of adoption or an interlocutory order of adoption, which by its own terms automatically becomes a final decree of adoption on a date specified in the order, which shall not be less than six months or more than one year from the date of issuance of the order[.]"

The interlocutory order entered by the probate court in this case was not "an interlocutory order of adoption, which by its own terms automatically [became] a final decree of adoption on a date specified in the order." Rather, the order stated that "this cause is continued until the child has lived in the home of the petitioner for at least six months." Therefore, this interlocutory order is not subject to the statutory language relied on by Barnebey.

The court finalized the adoption exactly fifteen months after the issuance of its interlocutory order. Barnebey's motion to vacate the interlocutory order on

grounds that her consent to the adoption was not freely given necessitated the delay in finalizing the adoption. In fact, it was in response to a motion filed by Barnebey that the court stayed any final order of adoption until the other motions before the court had been fully adjudicated. After the court ruled on the motions, it set a date, within one year of the issuance of the interlocutory order, for finalizing the adoption. Again, the process was delayed when Barnebey appealed from the court's adverse ruling on summary judgment and successfully moved the probate court to stay the adoption proceedings.[7]

We find, therefore, that this claimed error does not support a dismissal of the adoption petition.

## IV

To dispose of all issues on appeal, we must determine whether the appellate court acted appropriately when it reversed the probate court's grant of summary judgment in favor of Zschach on the issue of whether Barnebey's consent to the adoption is valid

Zschach urges that we need not reach the merits of whether summary judgment is appropriate on the issue of Barnebey's consent, asserting that the issue is time-barred pursuant to R.C. 3107.09(A). That division states that "consent to adoption is irrevocable and cannot be withdrawn after the entry of an interlocutory order or after the entry of a final decree of adoption when no interlocutory order has been entered." In support of her argument, Zschach points to the fact that Barnebey's allegations of fraud and undue influence were first asserted with respect to a motion to vacate the interlocutory order.

As we have stated on numerous occasions, parental consent to an adoption order "is [a] jurisdictional prerequisite which, if absent, allows the order to be attacked as void.* * *" *McGinty v. Jewish Children's Bur.* (1989), 46 Ohio St.3d 159, 161, 545 N.E.2d 1272, 1274. Furthermore, a valid consent is "one which has been freely, knowingly, and voluntarily given with a full understanding of the adoption process and the consequences of one's actions." *In re Adoption of Infant Girl Banda* (1988), 53 Ohio App.3d 104, 108, 559 N.E.2d 1373, 1378. Accordingly, a valid consent—one that is not the product of fraud, duress, undue influence, or the like—is a jurisdictional prerequisite to the issuance of an adoption order.[8] In *Marich v. Knox Cty. Dept. of Human Serv.* (1989), 45 Ohio

---

7. The court of appeals dismissed Barnebey's appeal for lack of a final appealable order on January 10, 1994. Even at that time, more than one year had elapsed since the probate court's issuance of its interlocutory order.

8. It is clear that under R.C. 3107.06(A), Barnebey's consent is required as a prerequisite to the probate court's issuance of an order of adoption.

St.3d 163, 543 N.E.2d 776, this court considered the effect of undue influence upon a natural parent's consent to a permanent surrender of parental rights. The syllabus of that case stated:

"When a public agency subjects a natural parent, who is a minor, single, and unrepresented by counsel, to undue influence, and as a result of that undue influence, the parent signs an agreement permanently surrendering her child, the parent's consent to the agreement is *invalid and the custody of the child remains with the parent.*" (Emphasis added.)

R.C. 3107.09(B) allows a parent the opportunity to withdraw consent to an adoption that is freely given if that parent demonstrates that withdrawal is warranted and is consistent with the best interest of the child. However, the legislature has limited the time within which a parent can move for withdrawal of a valid consent to adoption by requiring a motion under R.C. 3107.09(B) to be made prior to the entry of an interlocutory order of adoption or final order of adoption if no interlocutory order is issued.

A collateral attack upon an adoption decree for a court's lack of subject matter jurisdiction is not temporally limited by R.C. 3107.09(B). Instead, the time restriction placed upon such a motion is found in R.C. 3107.16(B). With a few statutorily recognized exceptions, that section provides that "[s]ubject to the disposition of an appeal, upon the expiration of one year after an adoption decree is issued, the decree cannot be questioned by any person * * * in any manner or upon any ground, including fraud, misrepresentation, failure to give any required notice, or lack of jurisdiction of the parties or of the subject matter[.]" Barnebey's motion to vacate the interlocutory order was filed within the time frame permitted under R.C. 3107.16(B).

The two statutes at issue here are reconcilable. R.C. 3107.09(B) applies to the parent who changes his or her mind after giving consent; R.C. 3107.16(B) applies to invalid consents. The legislative approach allows a narrow time frame for the challenge by a remorseful parent wishing to withdraw valid consent, while allowing up to one year after the adoption for a challenge to the legal validity of a consent (*i.e.,* subject matter jurisdiction).

Upon review of the summary judgment proceedings, however, we determine that the trial court correctly disposed of Barnebey's motion to vacate the interlocutory order of adoption. Neither Barnebey's deposition testimony, her affidavit, nor any of the other evidentiary materials properly before the trial court on summary judgment raise a genuine issue of material fact that Barnebey's consent to the adoption was the product of fraud or undue influence.

"Undue influence" is defined as " '[a]ny improper or wrongful constraint, machination, or urgency of persuasion whereby the will of a person is overpowered and he is induced to do or forbear an act which he would not do or would do

if left to act freely.'" *Marich*, 45 Ohio St.3d at 166, 543 N.E.2d at 780, quoting Black's Law Dictionary (5 Ed.1979) 1370. "Fraud" is "[a]n intentional perversion of truth for the purpose of inducing another in reliance upon it to part with some valuable thing belonging to him or to surrender a legal right." Black's Law Dictionary (6 Ed.1990) 660. An essential element of fraud is that the action or forbearance resulting in injury is proximately caused by the affected party's justifiable reliance on the false representation or concealment. *Burr v. Stark Cty. Bd. of Commrs.* (1986), 23 Ohio St.3d 69, 23 OBR 200, 491 N.E.2d 1101, paragraph two of the syllabus. Whether a challenge to an adoption consent is based on fraud, undue influence, or some other consent-vitiating factor, the real and ultimate fact to be determined is whether the party affected was denied the exercise of his or her free will. *Tallmadge v. Robinson* (1952), 158 Ohio St. 333, 340, 49 O.O. 206, 209, 109 N.E.2d 496, 500.

The record on summary judgment reveals that, prior to Barnebey's execution of a consent to the adoption, Zschach and Barnebey discussed their concern that the putative father desired to gain exclusive control over the child and their plans for Barnebey's future participation in the upbringing of the child if Zschach was successful in the adoption. While these factors may have had some influence on Barnebey's decision to execute a consent to the adoption, they did not deprive Barnebey of the exercise of her free will.

The record on summary judgment demonstrates that Barnebey took initial steps to place the child for adoption with three sets of adoptive parents before finally contacting Zschach. Further, in her deposition, Barnebey conceded that her consent to the adoption was executed of her own free will.

Accordingly, we reinstate the trial court's award of summary judgment regarding Barnebey's motion to vacate the interlocutory order of adoption.

### V

We reverse the judgment of the court of appeals in all respects.

*Judgment reversed.*

MOYER, C.J., and GLASSER, J., concur.

DOUGLAS, J., concurs separately.

RESNICK, J., concurs separately.

F.E. SWEENEY, J., concurs in judgment only.

PFEIFER, J., dissents.

GEORGE M. GLASSER, J., of the Sixth Appellate District, sitting for WRIGHT, J.

Douglas, J., concurring. Although I do not agree with much of the discussion in Parts I through III of the majority opinion, I concur with the findings of the majority that the putative father did not properly object to the adoption, that the putative father was not deprived of his constitutional right to due process, and that the probate court was not required to dismiss the adoption petition pursuant to R.C. 3107.14(C) and (D). I also concur with the ultimate judgment of the majority reversing the judgment of the court of appeals and reinstating the judgment of the trial court. However, unlike the majority, I would hold that R.C. 3107.09(A) is dispositive of the issue concerning the birth mother's consent to the adoption and, thus, I disagree with the discussion and analysis in Part IV of the majority opinion.

R.C. 3107.09(A) states that "[a] consent to adoption is *irrevocable and cannot be withdrawn* after the entry of an interlocutory order or after the entry of a final decree of adoption when no interlocutory order has been entered." (Emphasis added.) Here, the birth mother raised the issue that her unequivocal written consent to the adoption was induced by fraud, misrepresentation, and undue influence *after* the probate court had entered an interlocutory order placing the child with the adoptive parent. She was too late. After the issuance of the interlocutory order, the birth mother's consent to the adoption was irrevocable.

The majority, however, avoids the clear language of R.C. 3107.09(A) by observing that "parental consent to an adoption order 'is [a] jurisdictional prerequisite which, if absent, allows the order to be attacked as void. * * *' *McGinty v. Jewish Children's Bur.* (1989), 46 Ohio St.3d 159, 161, 545 N.E.2d 1272, 1274. Furthermore, a valid consent is 'one which has been freely, knowingly, and voluntarily given with a full understanding of the adoption process and the consequences of one's actions.' *In re Adoption of Infant Girl Banda* (1988), 53 Ohio App.3d 104, 108, 559 N.E.2d 1373, 1378. Accordingly, a valid consent—one that is not the product of fraud, duress, undue influence or the like—is a jurisdictional prerequisite to the issuance of an adoption order. [Majority opinion's footnote 8.]" In footnote eight to the majority opinion, the majority says that "[i]t is clear that under R.C. 3107.06(A), Barnebey's [the birth mother's] consent is required as a prerequisite to the probate court's issuance of an order of adoption." What the majority fails to grasp is that the probate court had subject matter jurisdiction in this case because the birth mother had consented to the adoption by filing a written consent form with the probate court. Only after the probate court had issued an interlocutory order did the birth mother seek to attack the voluntary nature of her consent to the adoption. At that point, it was too late for the birth mother to change her mind since, pursuant to R.C. 3107.09(A), her consent to the adoption had become irrevocable.

Next, the majority cites *Marich v. Knox Cty. Dept. of Human Serv.* (1989), 45 Ohio St.3d 163, 543 N.E.2d 776, in support of the proposition that R.C. 3107.09(A) did not preclude the birth mother from challenging her consent to the adoption following the issuance of the interlocutory order. However, *Marich* dealt with an agreement executed by a fifteen-year-old birth mother permanently surrendering a child to a public agency to care for the child and to place the child in a family home. See R.C. 5103.15. There was no adoption proceeding at issue in *Marich* and, obviously, there was no interlocutory or final order of adoption concerning the *Marich* child. In the case at bar, the birth mother signed a consent to the adoption of her child. Upon issuance of the interlocutory order of adoption, the birth mother was statutorily precluded from withdrawing her consent. See R.C. 3107.09(A). *Marich* indicates nothing to the contrary, and certainly does not support the majority's position concerning the timeliness of Barnebey's (the birth mother's) motion to vacate the interlocutory order of adoption.

Nevertheless, the majority holds that the motion filed by the birth mother challenging the voluntary nature of her consent was timely filed pursuant to R.C. 3107.16(B). This statute provides that "[s]ubject to the disposition of an appeal, *upon the expiration of one year after an adoption decree is issued,* the decree cannot be questioned by any person, including the petitioner, in any manner or upon any ground, including fraud, misrepresentation, failure to give any required notice, or lack of jurisdiction of the parties or of the subject matter[.]" (Emphasis added.) Not surprisingly, none of the parties to this appeal even cites R.C. 3107.16(B). The reason for this should be obvious—R.C. 3107.16(B) is inapplicable on the issue concerning the finality of Barnebey's consent to the adoption. Rather, it is the clear and unambiguous language of R.C. 3107.09(A) which governs the finality of Barnebey's consent. The court of appeals recognized this when it held, on reconsideration, that "[f]ollowing the interlocutory order of adoption in this case, * * * Nan Barnebey filed a motion to withdraw her consent to the adoption. *Ordinarily such a motion would be time barred pursuant to R.C. § 3107.09.* * * * However, as noted above, the interlocutory order in this case was erroneously entered [on the basis of the court of appeals' finding that the putative father's conditional consent was tantamount to an objection to the adoption]. As such, the natural mother's motion to withdraw her consent to the adoption was not time barred." (Emphasis added.) Given the findings of the majority opinion that the putative father's consent to the adoption was not necessary, it logically follows that the birth mother's consent to the adoption was irrevocable pursuant to R.C. 3107.09(A) and *could not be withdrawn following the entry of the interlocutory order of adoption.*

ALICE ROBIE RESNICK, J., concurring. I generally agree with the conclusions reached in each part of the majority opinion. I write separately to express my disagreement with portions of the analysis employed by the majority in Part IV

of its opinion to reach the conclusion that the trial court properly granted summary judgment in Zschach's favor on Barnebey's motion to vacate the interlocutory order of adoption.

As a necessary consequence of the majority's conclusion that Johnson's attempted conditional consent to the adoption is not equivalent to a written objection, and of the majority's reversal of the court of appeals on that issue, it follows that the trial court's interlocutory order of adoption was not entered erroneously. Thus, the issue concerning Barnebey's consent to the adoption addressed in Part IV of the majority opinion is best approached by asking this question: Under what circumstances, if any, may a valid interlocutory order of adoption be challenged by a birth mother who consented to the adoption?

Zschach contends that, pursuant to R.C. 3107.09(A), once an interlocutory order of adoption is entered, a birth mother's consent to the adoption becomes irrevocable, so that all challenges to the validity of the consent are foreclosed. I do not accept Zschach's position that R.C. 3107.09(A) makes a birth mother's consent unassailable once an interlocutory order is entered. I believe that, even though a birth mother may not "withdraw" her consent after the interlocutory order has been entered, in a limited number of situations a birth mother may seek to "vacate" her consent, despite R.C. 3107.09(A).[9]

If Barnebey had attempted to withdraw her consent prior to the trial court's entry of the interlocutory order, that attempted withdrawal would have been governed by R.C. 3107.09(B). However, since the interlocutory order was already in place when Barnebey first moved to vacate her consent, any concept of "withdrawal" or "revocation" of that consent is conclusively foreclosed by R.C. 3107.09(A). As the court of appeals noted, ordinarily a motion to withdraw consent is time-barred by R.C. 3107.09.

While an attempt to "vacate" a consent may at first glance seem to be the same thing as an attempt to "withdraw" a consent, I believe the two are distinguishable. In a limited number of situations, when certain fundamental irregularities are alleged that may have contaminated the birth parent's consent, the consent will be subject to challenge even though an interlocutory order (and perhaps even a final decree) of adoption have been entered. See, generally, Annotation, What Constitutes "Duress" in Obtaining Parent's Consent to Adoption of Child or Surrender of Child to Adoption Agency (1976 & Supp.1995), 74 A.L.R.3d 527;

---

9. In a case where a final decree of adoption has been issued, R.C. 3107.16(B) suggests that, in extraordinary circumstances, the decree is subject to challenge on limited grounds for up to one year after the decree has been issued. As R.C. 3107.16(B) uses the words "any person" to refer to the person questioning the final decree, the statute's implication is that a birth parent who seeks to overturn a decree of adoption by vacating a consent on file with the probate court may question even a final decree.

Annotation, What Constitutes Undue Influence in Obtaining a Parent's Consent to Adoption of Child (1973 & Supp.1995), 50 A.L.R.3d 918; Annotation, Annulment or Vacation of Adoption Decree by Adopting Parent or Natural Parent Consenting to Adoption (1948 & Supp.1996), 2 A.L.R.2d 887. Zschach's proposed absolutist interpretation of R.C. 3107.09(A) would equate a fundamental challenge to irregularities underlying the consent with the type of "change of mind" withdrawal of consent that the statute seems most applicable to. See Annotation, Right of Natural Parent to Withdraw Valid Consent to Adoption of Child (1976 & Supp.1995), 74 A.L.R.3d 421, 436 ("It has been held or recognized in a number of illustrative cases that, at least after the placement of the child, the natural parents may not arbitrarily and without cause withdraw a valid consent to adoption.").

I therefore agree with the majority that R.C. 3107.09(A) is not an absolute bar to an attempt to vacate a consent filed after the entry of an interlocutory order. Unlike the majority, I do not believe that this attempt to vacate a consent should be approached as a collateral attack on the probate court's subject matter jurisdiction. The probate court had subject matter jurisdiction over this adoption when it entered the interlocutory order. A consent signed by Barnebey was in the court's file, R.C. 3107.06(A) was therefore satisfied, and the probate court could proceed to deal with the adoption petition. The trial court determined that the consent was valid and proceeded accordingly. I do not accept the way the majority quotes selectively from McGinty v. Jewish Children's Bur. (1989), 46 Ohio St.3d 159, 161, 545 N.E.2d 1272, 1274, and In re Adoption of Infant Girl Banda (1988), 53 Ohio App.3d 104, 108, 559 N.E.2d 1373, 1378, to support its apparent conclusion that a trial court would in hindsight have lacked jurisdiction whenever it allowed an adoption proceeding to go forward based on what was later determined to be an invalid consent.

Since R.C. 3107.09(A) does not stand in the way of the trial court's considering an attempt to vacate consent filed before the entry of a final decree of adoption, such a consideration is within the scope of the court's continuing jurisdiction. The attack is on the consent itself, and ultimately on the interlocutory order of adoption based on the allegedly tainted consent. The attack is not on the jurisdiction of the court.

Recognizing that a consent may be challenged when, as here, an interlocutory decree of adoption has been entered does not mean that a consent will be easily vacated. As mentioned above, a consent to an adoption may not be "withdrawn" in such a situation, and may be challenged only when extraordinary irregularities surrounded the consent. Furthermore, the burden on a person seeking to vacate his or her consent to an adoption after the child has been placed in the adoptive home must be a heightened one, because the child will have begun to bond with

the adoptive parent or parents. Finally, the policy favoring finality of adoptions running throughout R.C. Chapter 3107 militates against a successful challenge to the consent. See, *e.g.*, R.C. 3107.15(A)(1), which provides that a final decree of adoption relieves the biological parents "of all parental rights and responsibilities" and terminates legal relationships between the adopted person and the biological parents "so that the adopted person thereafter is a stranger to his former relatives * * *."

In light of the foregoing considerations, I agree that the trial court ruled properly when it granted summary judgment in favor of Zschach on Barnebey's motion to vacate the interlocutory order based on Barnebey's allegedly tainted consent to the adoption. In addition to the factors cited by the majority to support its conclusion that the trial court ruled correctly on this issue, I am particularly struck by several additional facts surrounding Barnebey's allegedly "involuntary consent." At the time of the consent, Barnebey was over forty years of age. In a deposition contained in the record of this case dated May 6, 1993, Barnebey stated that she has a bachelor of science degree in ceramic engineering and a bachelor of arts degree in liberal studies, and also that she pursued a course of study in welding engineering in graduate school at Ohio State University for two additional years. Barnebey was a mature, educated woman at the time of the consent, and as such can be deemed to have appreciated the consequences of consenting to the adoption.

PFEIFER, J., dissenting. Millennia after Solomon, judges are still put in the difficult position of deciding who is to be awarded custody of children. Unlike Solomon, today's judges cannot base their decisions only on fundamental fairness. If we were able to do the fair thing in this case, it would be to order the parties to carry out the agreement they originally intended—custody to the adoptive parent with visitation by the natural parents. However, Ohio does not recognize "open" adoptions—pursuant to R.C. 3107.15(A)(1), biological parents lose all parental rights when their child is adopted. That is a fundamental fact which somehow escaped the knowledge of the parties, their lawyers, and the probate judge early on in this case. Other complicating factors are that the parties know each other, that they circumvented the legal process in originally placing the child, and that litigation begun in the child's infancy continues without final resolution well into her fourth year. Thus, we are forced to fit this most unusual scenario into a statutory scheme with "one size fits all" rules.

I dissent from the majority's holding that no genuine issues of fact remain as to whether Zschach gained Barnebey's consent through fraud or undue influence. I agree with the court of appeals that Barnebey deserves a hearing before a trier of fact on that most important issue. According to Barnebey's deposition and affidavit testimony, she sought Zschach's help only because she feared that

Johnson might take the child and move out of state. It was Barnebey's fear of not being able to see her daughter which set the series of events in motion. Zschach played on Barnebey's fears about Johnson, and persuaded Barnebey to let the child stay with her, where Johnson would not be able to find her. Barnebey claims that she consented to the adoption only because Zschach agreed to allow Barnebey and her other children be a part of the baby's life. The agreement apparently was that Barnebey and her children would be referred to as the baby's aunt and cousins. Barnebey believed she was consenting to an open adoption.

Barnebey's testimony, when viewed in a light most favorable to her, raises genuine issues of fact as to whether her consent was fraudulently induced. This case, one dealing with the most important of rights, was mishandled and too cavalierly dispensed with from the start. Barnebey deserves at least a hearing before a trier of fact.

I also dissent from the majority opinion in regard to Johnson. I agree with the court of appeals that Johnson's insistence on post-adoption visitation was tantamount to a written objection to the adoption. By conditioning his consent on visitation rights, Johnson, in writing, indicated that he did not consent to a legal adoption. Johnson's qualified consent was apparently accepted by the probate court, which then later told Johnson, in effect, that his qualified consent was meaningless. The whole adoption took place because of everyone's mistaken belief of what the law allows. Johnson should not be the party who pays for that misunderstanding.

This case belongs back where it started, in the probate court. This time, the natural parents' decision whether to consent to the adoption should be made with a full understanding of what their consent means.

After a three-year court battle, the double life of the little girl known to some as GlenNoel Zschach and to others as Cybele Johnson remains unsettled. Her gut-wrenching saga offers an important lesson about adoption in Ohio—that the desire for nonstranger, "open" adoptions is real, and that our laws in that area are inadequate. I would allow parties to a nonstranger adoption to enter into a separate contract setting forth terms of visitation, and would grant probate judges the discretion to determine if that agreement is in the best interest of the child.