OPINION
This appeal is brought by Plaintiff/Appellant R. Linda Decker (Lowd) from a Judgment Entry of the Hancock County Court of Common Pleas Juvenile Division overruling objections to the Magistrate's decision awarding joint custody of Lillian Andrea Lowd to Appellant and Appellee.
The record presents the following facts. Some time in early 1998, Appellant R. Linda Decker, now Lowd, and her brother Appellee Robert Decker, began to discuss the idea of Lowd bearing A child to be raised by Decker and his lifetime companion, Appellee David Pope. Decker wanted a child but did not believe that adoption was possible since both he and Pope were HIV positive. Pope was not a party to the initial discussions between brother and sister.
Eventually, Lowd and Decker came to an agreement in which Lowd would be artificially inseminated from the sperm of an anonymous donor. Decker would pay for the procedure and then later pay for all medical expenses arising from the delivery of the child. Lowd and Decker both agreed that the latter would "raise" the child. Brother and sister also agreed that Decker and Pope would not attempt to adopt the child and that Lowd would always be known as its mother. Furthermore, Lowd's three children would be known as the child's full siblings. The final term of the agreement was that Decker would stay with Lowd for a week after the baby's birth to care for Lowd and her children while she recuperated from the birth.
At the time the agreement was made, Lowd was not married and was separated from her 11-year boyfriend and father of her three children, Lance Lowd. The parties never used the term "surrogate mother" and they did not put the agreement into writing.
Pursuant to their agreement, Linda was artificially inseminated in October, 1999 at a clinic in Columbus, Ohio. The donor sperm was chosen by Pope and agreed on by Decker and Lowd. Pope chose the sperm because it conformed to his ethnic and genetic background. During the period after the insemination, but before birth, the parties began to realize they had different perceptions as to what exactly the "agreement" was. In January 1999, Lowd, Decker and Pope attended a counseling session in Columbus and Lowd was alarmed to hear the term "surrogate" used for the first time. Lowd became increasingly uneasy when Pope indicated that he wanted to limit her involvement in the child's life. As a result, Lowd refused to attend future counseling sessions at the clinic.
Nevertheless, on July 6, 1999, the day before the baby was born, Decker delivered a document to Lowd's home and asked her to sign it. The document was entitled "Custody Declaration" and contained a unilateral declaration that Lowd "unconditionally relinquish[ed]" custody of the unborn child to the child's "father, David A. Pope". According to Lowd, she was on medication for an abscessed tooth and was confused as to what the document was and asked for an explanation of the term "unconditionally". She was told that the document meant she would not interfere with the way Decker and Pope raised the child. Decker then drove Lowd to a notary public where she signed the document. Lowd claims that she did not intend to relinquish her rights to custody of Lillian.
Lowd went into the hospital on July 7, 1999 and gave birth to a girl via Cesarean section. Lowd named the baby Lillian Andrea, a name chosen by Decker and Pope. Thereafter, some controversy ensued concerning Lillian's birth certificate and her surname. Decker and Pope claim that the parties agreed that Pope would be named as Lillian's father on the birth certificate. Lowd, however, claims that she only agreed that Pope would be known as Lillian's father for insurance purposes. Several hours after the birth, a social worker met with Lowd to discuss Lillian's birth certificate, insurance coverage and medical care. The record does not indicate what was said during the discussion between Lowd and the social worker. What is known is that after the discussion, Lowd made arrangements to have the name "Lillian Andrea Lowd" placed on the birth certificate. She also made arrangements to have her then fiancé, Lance Lowd, named as Lillian's father and for the hospital to bill her insurance company for all of her and Lillian's medical care. Lillian left the hospital with Lowd and Decker, who, per the original agreement, stayed with Lowd for one week to care for her children while she recuperated.
From July to late August 1999, Lowd and Decker shared custody of Lillian by means of a self-prepared time schedule. In August, Decker told Lowd that it would be in Lillian's best interest for her to live with and be raised by Lowd. On September 7th, Decker picked up Lillian from Lowd's home to take her to a doctor's appointment and thereafter refused to return her to Lowd.
On September 10th, Lowd filed a Complaint for Custody with the Hancock County Court of Common Pleas, Juvenile Division. The matter came before a magistrate in November of 1999. The magistrate determined that Lowd intended to give Lillian to Appellees Decker and Pope. In addition, the magistrate concluded that the parties did in fact agree that Pope would be the baby's legal father and that his name would be placed on the birth certificate as such. The magistrate then recommended to the trial court that the parties continue with shared parenting responsibilities. Lowd entered timely objections to the magistrate's findings. The trial court affirmed the magistrate's decision in its May 9, 2001 Judgment Entry and Memorandum of Law. On June 21, 2001 the court issued an Order creating a legal relationship between David Pope and Lillian and establishing shared parenting between Pope and Lowd. The Order further directed that Lillian's last name be known as Pope and that her birth certificate be amended accordingly. It is from this Judgment Entry and order that Appellant Lowd now appeals.
Appellant raises the following assignments of error;
 I.The trial court erred to the prejudice of Plaintiff-Appellant when the court upheld the designation of Defendant/Appellee David Pope as the legal father of the subject matter minor child, Lillian Lowd.
 II. The trial court erred to the prejudice of Plaintiff-Appellant when it ordered in its June 8, 2001 Order for the Minor Child's Birth Certificate to be amended to reflect Appellee Pope as Lillian's legal father.
 III. The trial court erred to the prejudice of Plaintiff-Appellant when it ordered the parties to participate in a shared parenting plan even though no party requested it prior to hearing.
 IV. The trial court erred in concluding that the magistrate determined that the plaintiff had contractually forfeited her paramount right to custody under the Perales decision.
 V. The trial court erred to the prejudice of Plaintiff-Appellant when in its interpretation, contrary to the magistrate's determination, that she forfeited her paramount right to custody over Lillian so as to render her unsuitable under Perales.
 VI. The Court erred as a matter of law in determining that the parties established contract of surrogacy and even if they did said contract is not enforceable under Ohio law.
 VII. The Trial Court erred to the prejudice of the Plaintiff/Appellant in applying the standard of review for determination by the Magistrate as one of abuse of discretion.
 First and Second Assignments of Error
We first examine the issue of baby Lillian's parentage. "Legal parentage, not to be confused with biological parentage, must be established before the issue of custody can properly be decided." In reAdoption of Reams (1989), 52 Ohio App.3d 52, 56. In her first and second assignments of error, Lowd argues that the trial court erred when it declared David Pope the legal father of Lillian Lowd and ordered her birth certificate changed in accordance with that finding. We agree.
The magistrate, in her decision establishing a father-child relationship between Appellee Pope and baby Lillian, placed great weight upon the existence of an agreement between the parties designating Appellee Pope as father. (See Magistrate's Decision pg 7.) However, Ohio law requires much more than a meeting of the minds when it comes to the disposition of a child. The magistrate and, subsequently, the trial court failed to consider at least three important statutes that ultimately render the decision below unsound.
The first statute, R.C. 3111.02, provides two methods for establishing parentage between a father and a child; an acknowledgement of paternity or proof of adoption. In other words, the law will recognize a man as a child's father once he acknowledges that he provided the genetic material that created the child or that he went through the requisite adoption procedures. In the case sub judice, David Pope is not Lillian's biological father. In order to become her legal father he, by statute, must go through the proper procedures for adoption regardless of any agreement between himself and Lowd.
The second statute, R.C. 5103, governs the placement of children through adoption and mandates that all placements be supervised by the proper authorities. R.C. 51303.16 in relevant part provides:
 "* * * [N]o child shall be placed or accepted for placement under any written or oral agreement or understanding that transfers or surrenders the legal rights, powers, or duties of the legal parent, parents, or guardian of the child into the temporary or permanent custody of any association or institution that is not certified by the department of job and family services under section 5103.03 of the Revised Code * * *"
According to the Ohio Supreme Court, this provision serves "to ensure proper agency or court supervision of private placements." In re Adoptionof Zschach (1996), 75 Ohio St.3d 648 . Agency and court involvement in child placement prevents "black market" adoptions that may not be in the best interest of the child. See In re Proposed Adoption (1998),131 Ohio App.3d 358.
Appellees Decker and Pope similarly rely on the merits of an agreement made prior to Lillian's birth. Specifically, Appellees insist that Lowd agreed to "have a baby for Decker." Again, while that may be true, "[o]ne cannot claim the status of an adoptive parent merely through an oral agreement." Seymour v. Stotski (1992), 82 Ohio App.3d 87, 93. As another court stated, "It has long been recognized that, as a matter of public policy, the state will not enforce or encourage private agreements or contracts to give up parental rights." Belisto v. Clark (1994),67 Ohio Misc.2d 54 citing; Ingram, Surrogate Gestator: A New and Honorable Profession (1993), 76 Marquette L.Rev. 675.
Finally, the third statute controlling our finding on this issue is R.C. 3705.09(F)(2) which provides that when a mother is unmarried at the time of a child's birth, the mother will designate the surname of the child on the birth certificate. The name of the father will only be included if and when the father and mother sign an affidavit acknowledging paternity. Even after the father acknowledges paternity, the unmarried mother still retains the option to designate a surname for the child. In re Mantia-Allen (1996), 108 Ohio App.3d 302, 670 N.E.2d 570. Consequently, the trial court did not have the jurisdiction to order that Lillian's birth certificate be amended to reflect Pope's surname. Even if Appellee Pope was the child's biological father, as an unwed mother, Lowd retained the privilege to choose Lillian's surname. See Bowen v.Thomas (1995), 102 Ohio App.3d 196, 656 N.E.2d 1328
Incidentally, that is not to say that Lance Lowd is properly included on Lillian's birth certificate as the child's father. This Court does not have a copy of Lillian's birth certificate to review nor do we have any information surrounding the circumstances leading up to the insertion of Lance Lowd's name. This issue is not now before us.
These statutes render the lower court's Order establishing a father-child relationship between Pope and Lillian and ordering her name and birth certificate to be changed in accordance with that finding, improper. Appellant's first and second assignments of error are well taken.
 Third Assignment of Error
In her third assignment of error, Appellant alleges that the trial court erred when it ordered the parties to participate in a shared parenting plan despite the fact that neither party requested it. Again, we must agree.
Before addressing the merits of Appellant's argument, we first note that there is no statutory authority for a court to implement a shared parenting plan between a parent and a non-parent. R.C.3109.04(G) provides:
 Either parent or both parents of any children may file a pleading or motion with the court requesting the court to grant both parents shared parental rights and responsibilities for the care of the children in a proceeding held pursuant to division (A) of this section.* * *
Having already established that Appellees are not the parents of baby Lillian, shared parenting is not available.
Even if the law did provide for shared parenting between a parent and non-parent, shared parenting would remain improper in this case. The law is well settled on this point; shared parenting must be initiated by a parent. See McClain v. McClain (1993), 87 Ohio App.3d 856, 623 N.E.2d 242,Bowen v. Bowen (1999), 132 Ohio App.3d 616, 725 N.E.2d 1165. R.C.3109.04(D)(1)(b) gives a trial court discretion to approve a plan submitted by one or both parents. However, the statute does not give the trial court the authority to initiate a shared parenting arrangement. Inherent in shared parenting is the willingness of the parties to participate.
Appellant's third assignment of error is, therefore, well taken.
 Fourth, Fifth, Sixth Seventh Assignments of Error
In her fourth, fifth, and sixth assignments of error, Appellant Lowd asserts that the trial court improperly concluded that she had contractually given up her paramount right to custody of baby Lillian. Furthermore, in the seventh assignment of error, Lowd alleges that the trial court applied the wrong standard of proof to the magistrate's findings on this issue. We agree.
The Ohio Supreme Court, in In re Perales (1977), 52 Ohio St.2d 89, established the standard for custody disputes between parents and non-parents. In that case, the Court considered whether a mother who had agreed to surrender custody of her minor child to a non-parent could successfully regain custody of that child. The Court, impressing upon the importance of making a decision in light of the best interests of the child, ultimately held:
 "[T]hat parents may be denied custody only if a preponderance of the evidence indicates abandonment, contractual relinquishment of custody, total inability to provide care or support, or that the parent is otherwise unsuitable that its, that an award of custody would be detrimental to the child." Id. at 98.
The Court then went on to explain the language, "otherwise unsuitable" by explaining that once the determination is made that the parent has forfeited rights to a child or that parental custody would be detrimental to a child, the court must then, by preponderance of the evidence, make a finding that granting custody to the parent would be unsuitable. Id. It is feasible, therefore, for a parent to contractually relinquish their rights to custody and still reacquire custody based on the non-parent's inability to show parental unsuitability.
In the instant case, the magistrate made a conclusive finding that there was not a formal surrogate agreement nor a contract and that both Appellant and Appellee were suitable in terms of their ability to provide a home for baby Lillian. While Lowd may have signed a unilateral statement relinquishing custody, a unilateral statement is not a contract. Indeed the magistrate stated, "If we were to strictly follow Inre Perales, Plaintiff would have to be named the residential parent of Lillian." (See Magistrate's Decision pg. 6) The magistrate then went on to disregard that precedent based on her own conclusion that Appellant Lowd "never intended to raise this child." (See Magistrate's Decision pg. 7). The trial court later surmised that, based on the findings of the magistrate, there was some reliable, credible evidence that Lowd had forfeited her paramount right to custody.
We find this to be an improper standard for the trial court's review of the magistrate's order and indeed if it were proper it is inconsistent with the magistrate's finding. According to Juv. R. 40(E)(4)(b), a court may adopt, reject, or modify the magistrate's decisions, hear additional evidence, recommit the matter, or hear the matter itself. Thus, the trial court's review for abuse of discretion is improper.
The law does not put any significance on Appellant Lowd's original intentions. The Perales holding is the law and states that in custody disputes between a parent and a non parent, the parent has a paramount right to custody unless that parent contractually relinquished custody and it is determined by a preponderance of the evidence that parental custody would be detrimental to the child. Based on the findings of the magistrate, Appellees have not overcome the presumption that Lowd has the paramount right to custody of Lillian. Appellant's fourth, fifth, sixth and seventh assignments of error are well taken.
The judgment of the Hancock County Common Pleas Court, Juvenile Division is REVERSED and the cause REMANDED to that court for entry of judgment in accordance with this opinion, restoring the exclusive custody of the minor child, Lillian Lowd to her mother, Appellant R. Linda Lowd.
WALTERS, P.J., and HADLEY, J., concur.