[Cite as *In re J.P.*, 2024-Ohio-4916.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In The Matter of: | : | |
| [J.P., | : | No. 24AP-71 |
| | | (C.P.C. No. 20JU-4947) |
| T.T., Mother, | : | |
| | | (REGULAR CALENDAR) |
| Appellant]. | : | |

D E C I S I O N

Rendered on October 10, 2024

**On brief:** *Robert J. McClaren*, and *Jessica Birrer*, for appellee Franklin County Children Services.

**On brief:** *William T. Cramer*, for appellant.

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch

DORRIAN, J.

{¶ 1} Appellant, T.T., appeals from a judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch terminating her parental rights and granting permanent custody of her child, J.P., to Franklin County Children Services ("FCCS"). For the following reasons, we affirm.

**I. Facts and Procedural History**

{¶ 2} On July 6, 2020, FCCS filed a four-count complaint in the juvenile court asserting J.P. was abused pursuant to R.C. 2151.031(C) and (D), neglected pursuant to R.C. 2151.03(A)(2), and dependent pursuant to R.C. 2151.04(C). According to the complaint, on July 4, 2020, police were called to a home shared by appellant and her boyfriend, T.L. Appellant was determined to be the primary aggressor in a violent incident between the two. J.P. was present during the incident. Appellant was arrested and charged with

domestic violence and assault. Because appellant refused to make a safety plan for J.P.'s care, he was taken to FCCS for safekeeping. The complaint further alleged police previously had been to the home multiple times regarding domestic disturbances, theft issues, and mental health disturbances. The complaint also alleged that J.P. was placed in foster care; he was later observed to be missing four teeth. According to the complaint, reports indicated that appellant had punched J.P., causing three of his teeth to fall out and loosening another; J.P. removed the fourth tooth from his mouth. The complaint further alleged that appellant currently was in jail and was to be arraigned the next day.

{¶ 3} A juvenile court magistrate issued an emergency care order on July 6, 2020, authorizing FCCS to provide temporary care for J.P. On July 7, 2020, the magistrate issued an order granting FCCS temporary custody of J.P.

{¶ 4} On July 14, 2020, the juvenile court appointed a Court Appointed Special Advocate ("CASA") of Franklin County as guardian ad litem for J.P.

{¶ 5} An adjudicatory hearing was held before a magistrate on September 21, 2020. Based on the uncontested allegations in the complaint, the magistrate issued a decision (adopted by the juvenile court on November 6, 2020) finding J.P. to be abused, neglected, and dependent.

{¶ 6} FCCS filed a case plan on November 5, 2020. Among other provisions, the case plan required appellant to meet J.P.'s basic needs, participate in a domestic violence assessment and complete recommended classes, participate in individual counseling and follow recommendations of the service provider, and complete a mental health assessment and follow recommendations of the service provider.

{¶ 7} On May 11 and October 21, 2021, respectively, FCCS and the National Youth Advocate Program ("NYAP") filed first and second motions for extensions of temporary custody.[1] The juvenile court granted those motions on July 20, 2021 and January 4, 2022, respectively.

{¶ 8} On April 20, 2022, FCCS moved for permanent custody of J.P. pursuant to R.C. 2151.414(D)(2) and (B)(1).

---

[1] The motions identify NYAP as the managed care provider for the case "pursuant to contract with FCCS and [R.C. Chapter 5153]."

{¶ 9} The juvenile court conducted a hearing on the motion for permanent custody on November 7, 2023. Appellant did not attend the hearing. Counsel for appellant was present, averred that appellant had been notified of the proceedings, and advocated on her behalf.

{¶ 10} At the outset of the hearing, the juvenile court indicated it had conducted an in camera interview with J.P. that morning. The court characterized J.P. as "a pretty mature young man for 10," and averred that he "clearly was able to express his * * * desires and his feelings about this case, and about the possibility of returning to either his mother or the previously alleged putative father." (Tr. at 5.)

{¶ 11} Allison Hamilton, a family case manager for NYAP, testified on behalf of FCCS. Hamilton was assigned as J.P.'s caseworker in 2021. She asserted the present case was opened as a result of J.P. witnessing a domestic violence incident between appellant and her boyfriend. According to Hamilton, appellant was arrested for domestic violence and chose not to make a safety plan for J.P. Accordingly, J.P. was taken to FCCS for safekeeping. Hamilton verified the domestic violence incident she testified to was the same one set forth in the complaint and adjudicated through the present court case. Hamilton testified that appellant plead guilty to a "lesser charge" following the incident. (Tr. at 22-23.)

{¶ 12} Hamilton confirmed that J.P. has been in the continuous temporary custody of FCCS since July 7, 2020. He was placed in a foster home on July 7, 2020 and has lived with the same foster family continuously since that date; the foster home is a possible adoptive home for J.P.

{¶ 13} Hamilton verified that a case plan was developed for appellant, requiring her to participate in both domestic violence and mental health assessments and counseling.[2] Hamilton averred appellant has not completed a domestic violence assessment; however, she completed an on-line domestic violence course (Courseforviolence.com) two years ago. Hamilton is not aware of any instances of domestic violence involving appellant subsequent to her completion of the on-line program. Appellant also completed a mental health assessment and participated in mental health counseling through NYAP in 2021. She was unable to complete the services due to problems with her Medicaid insurance. Although the case plan did not require appellant to participate in parenting education, she completed an on-line parenting course two years ago.

{¶ 14} Hamilton described FCCS contact with appellant as "sporadic." (Tr. at 37.) According to Hamilton, FCCS contacts appellant through letters and email; however, telephone contact has been difficult because appellant frequently changes her telephone number and at times does not have a working telephone number. However, appellant calls "at times" and attends semi-annual reviews ("SARs") of her case plan. (Tr. at 38.)

{¶ 15} According to Hamilton, appellant has been in jail since October 29, 2023 on charges unbeknownst to Hamilton. Appellant has provided FCCS a Virginia address; however, over the course of the case, appellant has at times refused or been unwilling to

---

[2] According to Hamilton, the case plan also included J.P.'s alleged father, J.A.P. The record indicates J.A.P. filed a motion seeking legal custody of J.P. on April 13, 2022. J.P.'s birth certificate lists J.P.'s date of birth as February 2, 2014 and identifies J.A.P. as the father. Laboratory results of DNA testing of J.A.P. identified the probability of J.A.P.'s paternity as 0.00 percent and indicate that "[J.A.P.] is not the biological father of the child, [J.P.]." (FCCS Ex. 2.) According to Hamilton, J.A.P. was disappointed in the DNA test results because he expected to be identified as J.P.'s father. He told Hamilton he no longer wanted custody of J.P. According to Hamilton, J.A.P. has not complied with his case plan objectives; he last visited J.P. in December 2021 and has not requested visitation or had any contact with J.P. since that time. J.A.P. did not appear at the hearing. Wendy Pruden, the guardian ad litem for J.P., testified that to her knowledge, J.A.P. has not completed his case plan and she has concerns about J.P. being returned to J.A.P.'s care. She further averred that she recalled J.A.P. stating during one of the semi-annual reviews that he was relinquishing any rights he had to J.P. and no longer wanted to be involved in the case. In its January 11, 2024 entry granting permanent custody of J.P. to FCCS, the juvenile court stated that "[b]oth parents [sic] have abandoned [J.P.] and [J.P.] is not bonded with either Mother or Father [sic]." (Entry Granting Permanent Custody at 10.) The entry continued on to state that evidence was presented under R.C. 2151.414(B)(1)(b) and (E)(10), which address the criteria that the child was abandoned, but does not specify a reference to mother or J.A.P. Furthermore, the entry somewhat confusingly stated that evidence was presented under R.C. 2151.414(B)(1)(a) which addresses several alternative criteria including that the child was not abandoned. *See id*. Finally, the entry stated that "[t]his Decision and Judgement Entry divests Mother [T.T.], alleged father [J.A.P.] and unknown father, of all parental rights, privileges, and obligations as to [J.P.]; except to appeal the permanent custody order within thirty (30) days of the filing date of this Decision and Judgement Entry." (Entry Granting Permanent Custody at 11.) J.A.P. has not filed an appeal from the juvenile court's order terminating his parental rights to J.P.

provide an address. She has been hesitant to provide any information about her current living situation; accordingly, FCCS has been unable to verify whether appellant's home is a safe, stable environment for J.P. Hamilton averred FCCS lacks jurisdiction to make physical contact with appellant in her current home in Virginia.[3] Appellant has not provided FCCS with any current information regarding employment, income verification, or how she supports herself. Her last reported employment was two years ago.

{¶ 16} Hamilton described appellant's visitation with J.P. as "inconsistent." (Tr. at 44.) Appellant last visited J.P. in November 2021. Since that time, she has requested visitation with J.P., but has been unable to do so due to transportation issues. According to Hamilton, FCCS is unable to provide transportation assistance to appellant because she lives out of state. Hamilton acknowledged FCCS may have been able to supply appellant with gas cards had she requested them; however, appellant had never asked FCCS for transportation assistance. Hamilton further asserted that appellant's sporadic telephone contact with FCCS impeded efforts to schedule visitation with J.P.

{¶ 17} Hamilton testified J.P. is not bonded to appellant. In fact, J.P. reports that he does not like appellant and does not want to visit with her or talk to her; in short, he does not want to have any type of relationship with her. He also reports that he would like appellant to go to jail. By contrast, J.P. is bonded with his foster parents and their extended family and views his foster parents as parental figures. J.P. wants to continue living with his foster parents and would like them to adopt him. The foster parents have no biological or adopted children in their home; they have a small dog with whom J.P. enjoys spending time. Hamilton described J.P. as a "happy kid." (Tr. at 48.) He does well in school, follows rules, is easy to get along with, has no behavioral issues and has no special needs such as physical disabilities or mental health diagnoses. He has participated in mental health counseling since the inception of the case as required by FCCS for all children in J.P.'s circumstances. Hamilton testified she had "[n]o concerns" about the foster parents' ability to meet J.P.'s needs were they to adopt him. (Tr. at 49.)

{¶ 18} Hamilton averred she is apprehensive about returning J.P. to appellant. Specifically, Hamilton is concerned about appellant's ability to keep J.P. safe and provide

---

[3] A home study of appellant's previous Virginia home, conducted pursuant to the Interstate Compact on the Placement of Children, was not approved.

stability or adequate housing for him. According to Hamilton, appellant has not demonstrated she has a grasp on J.P.'s daily needs because she has not visited him in two years and has otherwise had no interaction with him. No evidence suggests that appellant has remedied the reasons J.P. was removed from her home. No current Interstate Compact on the Placement of Children ("ICPC") has been approved for appellant to receive custody of J.P. Hamilton also testified that appellant has not completed the mental health component of her case plan. Hamilton is not aware of appellant currently receiving mental health treatment, and FCCS has been apprised that appellant was involuntarily admitted to a facility for in-patient mental health treatment in Virginia on August 8, 2023. Hamilton has not received any mental health treatment updates from appellant nor has appellant responded to Hamilton's requests for updates. Appellant's mental health issues create ongoing concerns about J.P. returning to her care.

{¶ 19} Hamilton opined that J.P. is in need of a legally secure permanent placement. She further opined that it is in J.P.'s best interest for him to be committed to the permanent custody of FCCS for purposes of adoption. Hamilton testified as to her reasons for her "best interest" opinion as follows:

> J.P. is in a safe environment. It's unknown * * * if mom can keep J.P. safe. J.P. has stable housing. He is going to school. He has good grades. He's happy, he's thriving. He's growing. He does not want to be with his mother. He does not have a relationship, nor does he want a relationship with his mother. * * * [H]e's very upset with his mother for her behavior and just abandoning him. He reports just a lot of neglect in the past.

(Tr. at 52.)

{¶ 20} Finally, Hamilton testified that neither appellant nor J.A.P. have identified any family members as possible custodians for J.P., and FCCS, through its independent search, has not identified any possible custodians, family or otherwise, for J.P.

{¶ 21} On cross-examination by appellant's counsel, Hamilton testified that it is not her duty as a caseworker to look for possible familial custodial options for J.P.; rather, such duties are assigned to FCCS' "kinship department." (Tr. at 53.) Hamilton acknowledged that appellant has "done some things on her case plan"; however, Hamilton does not believe appellant's efforts have been "substantial." (Tr. at 53.) She further testified she learned

appellant was in jail sometime during the week preceding the permanent custody hearing. On cross-examination by counsel for CASA, Hamilton averred that FCCS typically makes referrals to local agencies for domestic violence assessments and does not generally accept completion of on-line courses as being compliant.

{¶ 22} Wendy Pruden also testified on behalf of FCCS. Pruden was appointed as a CASA lay guardian for J.P. on July 15, 2020. Since that time, she has visited J.P. in his foster home approximately 39 times and has interviewed him out of the presence of the foster parents. She has visited the foster parents at least 56 times and has observed J.P.'s interactions with them. She has interacted with appellant and J.A.P. on 7 occasions and has observed appellant interacting with J.P. more than 5 times. She has spoken to J.P.'s mental health counselors at least 8 times. She has reviewed J.P.'s court records as well as school district documentation. According to Pruden, J.P.'s school records indicate he is on an Individual Education Plan ("IEP"). Pruden has also reviewed documentation related to the parenting course appellant completed. In addition, she has reviewed the psychological evaluation report, mental health assessment, and criminal record pertaining to appellant. Pruden has also attended the SARs related to appellant's case plan.

{¶ 23} Pruden averred that J.P. is bonded with his foster parents and calls them "mom and dad." (Tr. at 62.) His foster mother is very affectionate, and J.P. cuddles and hugs her. When J.P. first entered foster care, he struggled with his writing skills. His foster father has helped him improve those skills and interacts with J.P. about sports. Pruden also noted that the foster mother sets rules for J.P. regarding his behavior and schoolwork and enforces those rules appropriately.

{¶ 24} As to her observations regarding J.P.'s interactions with appellant during visitation, Pruden averred that the visits were supervised and scheduled for two hours. The foster mother attends some of the visits. J.P. consistently asks to leave the visits early, stating that he feels "uncomfortable." (Tr. at 61.) Pruden described appellant as being affectionate with J.P. during the visits; although J.P. welcomes some affection from appellant, he often turns to his foster mother for affection. Pruden testified she does not think J.P. has appellant's telephone number and is unaware of any telephone communication between the two. Appellant last visited J.P. on November 18, 2021.

{¶ 25} Pruden further testified that to her knowledge, appellant has not completed her case plan. She further averred that she has concerns about J.P. being returned to appellant. As an example, Pruden noted that when J.P. first came into FCCS custody, she called J.P.'s previous school and was told that J.P. had not attended school for several months. Accordingly, she is worried that if J.P. returns to appellant, he will not attend school. Pruden also testified about reports from J.P. that appellant has punched him in the face and has forced him under the water in the bathtub; such incidents raise concerns with Pruden about appellant's mental health as related to parenting J.P. Pruden is not aware of appellant receiving mental health treatment and noted that appellant told her she had been admitted to a psychiatric hospital against her will in "[m]id-summer of 2023." (Tr. at 66.) Based on J.P.'s reporting of his interactions with appellant and his anger toward her, Pruden does not believe appellant "has the capacity to parent [J.P.] in a way that he needs it." (Tr. at 67.) Pruden further stated she is not convinced appellant will be able to meet J.P.'s basic needs regarding his education or mental health needs he may have.

{¶ 26} Pruden noted that J.P.'s current foster home is a possible adoptive home. She is not aware of any possible familial custodial options that have not been investigated by FCCS. She opined that J.P. is in need of a legally secure permanent placement and that it is in J.P.'s best interest for him to be committed to the permanent custody of FCCS, stating as follows:

> [J.P. has] been in temporary custody for over three years. He has experienced nightmares over those three years. It happens often before a hearing is * * * coming or he knows that he's going to have contact with his mother. That was told to me by foster mom. He stutters quite a bit when he starts to talk to me about the case and about his parents. I believe that's a major concern. He has made significant progress at school with his writing and his IEP. He's very excited about school. He has a lot of friends there. He's in a stable environment, that's healthy and it's safe for him. And I think that is what he needs right now.

(Tr. at 68.)

{¶ 27} On cross-examination by counsel for CASA, Pruden averred that she spoke to J.P. the week prior to the hearing. During that conversation, J.P. told her he wanted his foster parents to adopt him. When asked if he understood what adoption means, he stated,

"that means * * * this lasts forever. I will live here forever and I will be a [foster family's surname]." (Tr. at 71.) Pruden identified her most recent GAL report, filed with the juvenile court on November 1, 2023; over objection by counsel for appellant, the report was admitted as "GAL Ex. A."

{¶ 28} Counsel for appellant presented no witnesses or other evidence on behalf of appellant. Counsel requested a continuance on grounds that appellant was currently in jail and FCCS had not apprised him of that circumstance. Counsel argued that appellant's being in jail handicapped her ability to contest the case. In response, counsel for FCCS argued that it is the duty of appellant's counsel to request conveyance of appellant from jail; counsel acknowledged that appellant's attendance at the present hearing would probably not be feasible given that appellant was in jail in another state. Counsel further argued that appellant does not have a constitutional right to appear for trial. Counsel further noted that FCCS' permanent custody motion has been pending since April 2022 and that J.P. has been in FCCS custody since July 2020. Counsel for CASA also opposed the continuance, arguing that appellant's jail term resulted from her own actions. Counsel further maintained that J.P.'s best interest necessitated the matter proceed to a permanent resolution. The juvenile court denied the motion for continuance.

{¶ 29} Following closing arguments, the juvenile court granted FCCS' motion for permanent custody. In so doing, the court made numerous oral findings regarding the evidence submitted at the hearing as pertinent to the applicable statutory criteria. The court directed counsel for FCCS to prepare an entry consistent with its oral ruling.

{¶ 30} In its entry filed January 11, 2024, the juvenile court found by clear and convincing evidence that FCCS' permanent custody motion "must be granted under [R.C.] 2151.414(D)(2) due to all of the necessary elements applying in this case," and that "[a]lternatively, FCCS also met the evidentiary standard to show that granting the Agency's motion under [R.C.] 2151.414(B)(1) [was in the child's best interest]." (Emphasis sic.) (Entry Granting Permanent Custody at 4.) Accordingly, the juvenile court granted FCCS' motion and committed J.P. to the permanent custody of FCCS.

## II. Assignments of Error

{¶ 31} In a timely appeal, appellant advances the following two assignments of error for our review:

[I.] The juvenile court violated Due Process by denying a continuance and proceeding without mother being present.

[II.] The weight of the evidence does not support the judgment because the entry contains several factual errors.

## III. Discussion

{¶ 32} "Parents have a 'fundamental liberty interest' in the care, custody, and management of [a] child." *In re Murray*, 52 Ohio St.3d 155, 157 (1990), quoting *Santosky v. Kramer,* 455 U.S. 745, 753 (1982). As such, "[t]he right to parent one's child is a fundamental right protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article I, Section 16, of the Ohio Constitution." *In re L.W.*, 10th Dist. No. 17AP-586, 2018-Ohio-2099, ¶ 6, citing *In re A.J.*, 10th Dist. No. 14AP-284, 2014-Ohio-5046, ¶ 18.

{¶ 33} However, the right to parent one's child is not unlimited, and the state has broad authority to intervene to protect children from abuse and neglect. *L.W.*, citing *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 28, citing R.C. 2151.01; *In re L.B.*, 10th Dist. No. 19AP-644, 2020-Ohio-3045, ¶ 23. As an "alternative of last resort * * * only justified when it is necessary for the welfare of the children," a court may terminate parental rights and commit a child to the permanent custody of a public children services agency. *In re Swisher*, 10th Dist. No. 02AP-1408, 2003-Ohio-5446, ¶ 26; *L.W.* at ¶ 6. Due to the extreme nature of this remedy, which has been described as the family law equivalent of the death penalty in a criminal case, parents " 'must be afforded every procedural and substantive protection the law allows.' " *L.B.* at ¶ 22, quoting *In re Hayes*, 79 Ohio St.3d 46, 48 (1997).

{¶ 34} Appellant's first assignment of error contends the juvenile court violated her right to due process of law by denying her counsel's motion for a continuance and conducting the permanent custody hearing in her absence. Appellant acknowledges she was in jail at the time of the hearing. Appellant asserts FCCS was aware she was in jail but never informed her counsel of that fact; indeed, counsel learned appellant was in jail only through Hamilton's testimony. Appellant maintains that once her counsel became aware she was in jail, he moved for a continuance in order to make arrangements for her attendance at the hearing.

{¶ 35} While parents have a constitutionally protected right to be present at permanent custody hearings, such a right is not absolute if the parent is incarcerated. *In re Sears*, 10th Dist. No. 01AP-715 (Jan. 31, 2002), citing *In re Vandale*, 4th Dist. No. 92 CA 31 (June 29, 1993); *In re M.M.*, 4th Dist. No. 14 CA 6, 2014-Ohio-5111, ¶ 43. "The standard to use to determine if an incarcerated parent should be present at a permanent custody hearing should be based on 'the best interest of the child or children involved. It is almost always in the best interest of the child to have the parent attend and testify in person in a permanent custody hearing. In making a well-reasoned and informed decision, a trial court is best served by having available as much information as possible. All things being equal, the testimony from a parent would provide more information than not having the parent.' " *Sears*, quoting *Vandale.*

{¶ 36} In evaluating the due process right of an incarcerated parent to be present at a permanent custody hearing, this court and others have applied the balancing test set forth in *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). *Sears*; *In re K.L.*, 10th Dist. No. 13AP-218, 2013-Ohio-3499, ¶ 43; *In re L.C.*, 2d Dist. No. 27174, 2016-Ohio-8188, ¶ 8-9; *M.M.* at ¶ 44; *In re Sprague*, 113 Ohio App.3d 274, 276 (12th Dist.1996). The *Mathews* test requires the court to consider three factors: "[1] the private interest that will be affected by the official action; [2] the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and [3] the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* at 335; *Sears*; *L.C.* at ¶ 9; *M.M.* at ¶ 44; *Sprague* at 276. In order to determine if the juvenile court erred in denying counsel's oral request to continue the case so appellant could be present, we will evaluate the three factors set forth in *Mathews.*

{¶ 37} With respect to the first factor, the permanent custody hearing will affect a significant private interest of appellant. As previously stated, appellant has a "fundamental liberty interest" in the "care, custody, and management" of J.P. *Murray* at 157. This liberty interest does not evaporate simply because appellant was in jail, was not a model parent, or lost temporary custody to FCCS. *Sears*, citing *Santosky* at 753; *M.M.* at ¶ 45.

{¶ 38} In addition to appellant's private interest, a court must also consider the child's private interest. *M.M.* at ¶ 46, citing *In re B.C.*, 141 Ohio St.3d 55, 2014-Ohio-4558,

¶ 20. "When a court considers a permanent custody motion, the parent's interest '[is] subordinate to the child's interest.' " *Id.*, quoting *B.C.* at ¶ 20. "[T]he child's private interest 'at least initially, mirrors [the] mother's, *i.e.*, [the child] has a substantial interest in preserving the natural family unit. But when remaining in the natural family unit would be harmful to [the child], [the child's] interest changes. [The child's] private interest then becomes a permanent placement in a stable, secure, and nurturing home without undue delay. *See In re Adoption of Zschach*, 75 Ohio St.3d 648, 651 (1996). "There is little that can be as detrimental to a child's sound development as uncertainty over whether he is to remain in his current 'home,' under the care of his parents or foster parents, especially when such uncertainty is prolonged." ' " *Id.*, quoting *B.C.* at ¶ 20, quoting *Lehman v. Lycoming Cty. Children's Servs. Agency*, 458 U.S. 502, 513-14 (1982). Accordingly, although appellant has a significant private interest, J.P. has a greater interest in being placed in a stable, secure, and nurturing home without undue delay.

{¶ 39} Regarding the second *Mathews* factor, any risk of erroneous deprivation of appellant's private interest in not attending the permanent custody hearing appears to have been fairly low. The record does not establish why appellant was in jail or for how long she would be there; as such, there is no way to determine if J.P. could be placed with appellant within any reasonable time. In addition, by the time of the hearing, three and one-half years had passed since FCCS was granted temporary custody of JP; appellant had been non-compliant with her case plan, her contact with the caseworker was sporadic, and her last contact with J.P. was two years prior. Further, counsel meaningfully represented appellant at the hearing, a complete record of the hearing was made, and appellant has failed to demonstrate what additional testimony or evidence she would have offered that would have changed the outcome of the case. *See M.M.* at ¶ 50. *See also Sprague* at 277.

{¶ 40} As to the third *Mathews* factor, i.e., the state's interest in parental termination proceedings, we noted in *Sears* that "two state interests are at stake in a permanent custody proceeding. One interest is that the state has a *parens patriae* interest in preserving and promoting the welfare of the child. Secondly, the state has a fiscal and administrative interest in reducing the cost and burden of such proceedings. In a permanent custody proceeding the state's *parens patriae* interest is served by procedures

that 'promote an accurate determination of whether the natural parents can and will provide a normal home.' " *Sears*, quoting *Santosky* at 767.

{¶ 41} In *In re Elliott*, 4th Dist. No. 92 CA 34 (June 25, 1993), the Fourth District Court of Appeals stated:

> Permitting [appellant] to be present would be the optimal arrangement. However, allowing some other means of presenting [her] testimony would clearly serve the state's goal and the children's interest, and it would not impose any undue fiscal or administrative burden upon the state.

{¶ 42} As in *Elliott*, permitting appellant to attend the permanent custody hearing would be the optimal arrangement. However, allowing appellant to present her testimony via other means would clearly serve the state's goal and J.P.'s interest and would not impose any undue fiscal or administrative burden upon the state. However, appellant's counsel did not request the juvenile court to permit appellant's testimony by means other than attendance at the hearing. *See M.M.* at ¶ 49. Further, this court is well aware that there is a burden in terms of time, money, and manpower associated with conveyance of a prisoner, particularly one who is jailed outside the state, to a court proceeding. *See*, *e.g.*, *K.L.* at ¶ 44. Further, the state's interest in meeting J.P.'s best interests, as well as its interest in minimizing the risk and expense of transporting appellant from jail in another state, outweighs appellant's interest in personally appearing at the hearing. *Sprague* at 277.

{¶ 43} In sum, a balancing of the *Mathews* factors demonstrates the juvenile court did not deprive appellant of her due process rights by denying her counsel's request for a continuance in order for her to be transported from jail so that she could attend the permanent custody hearing.

{¶ 44} We further note that a trial court's discretion on a motion to continue "is a matter that is entrusted to the broad, sound discretion of the trial judge." *State v. Unger*, 67 Ohio St.2d 65 (1981), syllabus. "An appellate court must not reverse the denial of a continuance unless there has been an abuse of discretion." *Id.* at 67. The term abuse of discretion implies an unreasonable, arbitrary, or unconscionable attitude. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). When applying an abuse-of-discretion standard, an appellate court may not substitute its judgment for that of the trial court. *Berk v. Matthews*, 53 Ohio St.3d 161, 169 (1990).

{¶ 45} " 'There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.' " *Unger* at 67, quoting *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964). In *Unger*, the Supreme Court of Ohio instructed:

> In evaluating a motion for a continuance, a court should note, *inter alia*: the length of the delay requested; whether other continuances have been requested and received; the inconvenience to litigants, witnesses, opposing counsel and the court; whether the requested delay is for legitimate reasons or whether it is dilatory, purposeful, or contrived; whether the defendant contributed to the circumstance which gives rise to the request for a continuance; and other relevant factors, depending on the unique facts of each case.

*Id*. at 67-68.

{¶ 46} In the present case, the juvenile court did not expressly set forth its reasons for denying the continuance. However, following review of the record, we conclude the juvenile court did not abuse its discretion in denying the continuance, as the *Unger* factors favor such denial.

{¶ 47} Specifically, the record indicates that appellant had been notified of the hearing date. Appellant did not inform counsel or the court that she was in jail and thus unavailable to attend the hearing. Regarding the length of the delay requested, we note the record does not indicate why appellant was in jail or how long she would be there. Because counsel was unaware appellant was in jail until midway through the hearing, he could not indicate with any assurance the length of the requested continuance. As to other continuances requested and received, the record reveals that several continuances were granted subsequent to the filing of the motion for permanent custody. All but one of the continuances were requested by FCCS or the court. The only continuance requested by appellant was filed shortly after counsel was appointed to her case. Regarding the inconvenience to litigants, witnesses, opposing counsel, and the court, we note that the permanent custody motion had been pending for approximately 19 months at the time of the hearing. Postponement of the hearing for an indefinite period of time to secure appellant's attendance would certainly inconvenience the parties, witnesses, opposing

counsel, and the court.   There is no indication in the record the requested delay is dilatory, purposeful, or contrived; rather, the requested continuance was for a legitimate purpose, i.e., to secure appellant's attendance at a hearing adjudicating the termination of her parental rights.   Appellant clearly contributed to the circumstance giving rise to the request for a continuance, as she was in jail at the time of the hearing.  As to "other relevant factors," we note that appellant's brief does not suggest what evidence she would have presented that differed from, questioned, or enhanced the evidence other witnesses presented at the hearing.   Finally, and perhaps most importantly, we note that at the time of the hearing, J.P. had been in the temporary custody of FCCS since July 7, 2020; after approximately three and one-half years, J.P. unquestionably needs a legally secure, permanent placement without undue delay.

{¶ 48} Based on the circumstances present in this case, we find no error in the juvenile court's decision to deny counsel's request for a continuance to secure appellant's attendance at the hearing.  We thus overrule appellant's first assignment of error.

{¶ 49} In her second assignment of error, appellant contends the weight of the evidence does not support the juvenile court's judgment because the entry contains several factual errors.

{¶ 50} A court of appeals will not reverse a juvenile court's decision on a permanent custody motion unless the decision is against the manifest weight of the evidence.  *L.W.* at ¶ 8, citing *In re M.E.V.*, 10th Dist. No. 08AP-1097, 2009-Ohio-2408, ¶ 10. " 'Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence.' " *Id.*, quoting *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279 (1978), syllabus. "[I]n reviewing a judgment under the manifest weight standard, a court of appeals weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *L.B.* at ¶ 27, citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20.  This court must make every reasonable presumption in favor of the juvenile court's findings of fact and judgment, and, if the evidence is susceptible of more than one construction, give it the interpretation most consistent with the juvenile

court's judgment. *Id.* at ¶ 28. In addition, this court has stated that the juvenile court's discretion in determining whether permanent custody is in the child's best interest " ' "should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." ' " *In re A.L.D.*, 10th Dist. No. 08AP-238, 2008-Ohio-3626, ¶ 8, quoting *In re Hogle*, 10th Dist. No. 99AP-944 (June 27, 2000), quoting *In re Awkal*, 95 Ohio App.3d 309, 316 (8th Dist.1994).

{¶ 51} Appellant's assignment of error necessitates a thorough and detailed review of the juvenile court's judgment entry. Citing the testimony provided by Hamilton (the caseworker) and Pruden (the guardian ad litem), the juvenile court determined that FCCS established by clear and convincing evidence[4] that permanent custody must be granted under R.C. 2151.414(D)(2) "due to all of the necessary elements applying in this case." (Entry Granting Permanent Custody at 4.)

{¶ 52} R.C. 2151.414(D)(2) provides:

> If all of the following apply, permanent custody is in the best interest of the child, and the court shall commit the child to the permanent custody of a public children services agency or private child placing agency:
>
> (a) The court determines by clear and convincing evidence that one or more of the factors in [R.C. 2151.414(E)] exist and the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent.
>
> (b) The child has been in an agency's custody for two years or longer, and no longer qualifies for temporary custody pursuant to [R.C. 2151.415(D)].
>
> (c) The child does not meet the requirements for a planned permanent living arrangement pursuant to [R.C. 2151.353(A)(5)].
>
> (d) Prior to the dispositional hearing, no relative or other interested person has filed, or has been identified in, a motion for legal custody of the child.

---

[4] " 'Clear and convincing evidence is that measure or degree of proof which is more than a mere "preponderance of the evidence," but not to the extent of such certainly as is required "beyond a reasonable doubt" in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.' " *L.B.* at ¶ 24, quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶ 53} Under its analysis of R.C. 2151.414(D)(2)(a), the juvenile court averred that: J.P. was present during a domestic dispute at appellant's home; lost four teeth following appellant striking him in the mouth; appellant initially voluntarily allowed J.P. to be placed in FCCS custody; J.P. came into FCCS custody on July 7, 2020; following an unsuccessful kinship search, J.P. was placed in foster care; J.P. was adjudicated an abused, neglected, and dependent child in September 2020; a case plan was adopted by the court in November 2020; as part of the search for a kinship placement for J.P., a home study was completed for a relative in Tennessee, but further pursuit of that placement was halted after the relative was no longer interested in custody of J.P; and J.P. has remained in FCCS custody continuously since July 7, 2020.

{¶ 54} The juvenile court discussed the objectives set forth in appellant's case plan and found that although FCCS had made reasonable efforts to assist appellant with the case plan, she had failed to substantially comply with case plan objectives, that the issues leading to removal of J.P. from appellant's care had not been remedied, and there were ongoing concerns about J.P.'s safety if he were returned to appellant. The court further found appellant had not been forthcoming about circumstances regarding housing and employment.

{¶ 55} As to the specific case plan objectives pertaining to appellant's mental health and domestic violence issues, the juvenile court averred that appellant had self-reported she has in the past sought individual counseling for OCD, PTSD, and anxiety, but no longer participates in counseling for those conditions. The court further found that appellant has in the past been hospitalized for mental health issues but is currently not attending mental health programming; as such, ongoing concerns remain regarding appellant's ability to parent J.P. given her untreated mental health conditions. Regarding the domestic violence issue, the court averred that appellant has not completed domestic violence programs or classes; as such, ongoing concerns remain about appellant's domestic violence issues affecting J.P.

{¶ 56} The juvenile court also maintained that J.P. has special needs; he is involved in therapeutic behavioral services, has some speech delays, and has ongoing needs for mental health treatment resulting from past trauma and observing violence in appellant's home.

{¶ 57} Regarding J.P.'s bond with appellant and his foster family, the juvenile court found J.P. is not bonded to appellant; in contrast, J.P. is bonded to his foster family and is comfortable in his foster home. The court specifically noted Pruden's testimony that it would be detrimental to J.P. to be removed from his foster home, given how bonded he is to them, the length of time he had been in their care, and his desire to remain with his foster family and not return to appellant's care.

{¶ 58} Considering R.C. 2151.414(D)(2)(b), the juvenile court noted that both Hamilton and Pruden testified that J.P. had been in FCCS custody for well over three years. The court concluded that since J.P. had been in FCCS custody for over three years at the start of trial, he no longer qualifies for temporary custody under R.C. 2151.414(D).

{¶ 59} The juvenile court next addressed R.C. 2151.414(D)(2)(c). Noting FCCS' evidence (including the testimony of Hamilton and Pruden and J.P.'s birth certificate) establishing J.P.'s date of birth as February 7, 2014, the court concluded that J.P. does not qualify for a planned permanent living arrangement under R.C. 2151.353(A)(5), which requires that a child be over 16 years of age.

{¶ 60} As to R.C. 2151.414(D)(2)(d), the juvenile court found that at the start of trial, no interested party had filed a motion requesting legal custody of J.P.; further, no interested party appeared at trial to orally request legal custody, and counsel was unable to produce the name of any interested party. The court further found that FCCS' investigation into potential kinship placements was unsuccessful.

{¶ 61} The juvenile court concluded as follows:

> The evidence has shown by clear and convincing standard that the burden put forth in [R.C.] 2151.414(D)(2) has been met, and that permanent custody is in the best interest of [J.P.] and the Court must grant permanent custody. The evidence has shown by clear and convincing standard that all the required elements apply. The same concerns that led to the initial removal of the child still exists [sic] at the time of trial and that the child cannot and should not be placed with either parent at this time. The Court finds that the child has been in Agency custody since July 7, 2020, and that there is no additional time available for the Agency to hold Temporary Custody. The Court finds that one or more of the factors set forth in R.C. 2151.414(E)(1)–(16) were proven to exist to a clear and convincing standard. Neither mother nor Alleged Father has demonstrated a willingness to care for [J.P.] on a consistent

basis, evidenced by their inability to even visit him consistently or have phone contact on a regular basis. The reasons [J.P.] was removed from Mother's care has [sic] not been addressed because there is not significant case plan completion on behalf of Mother. Father, though not having much to do on the case plan, has all but sworn off any relationship or interest in [J.P.'s] life. Both parents have abandoned [J.P.] and [J.P.] is not bonded with either Mother or Father.

(Jan. 11, 2024 Jgmt. Entry at 9-10.)

{¶ 62} The juvenile court further determined that due to its finding that a grant of permanent custody was in J.P.'s best interest under R.C. 2151.414(D)(2), analysis of R.C. 2151.414(B)(1) was unnecessary. However, the court found that the evidence relied upon

in its analysis of R.C. 2151.414(D)(2) also satisfied the elements of R.C. 2151.414(B)(1)(a), (b) and (c)[5] as well as 2151.414(E)(1), (4), (10), (14) and (16).[6]  The court stated:

> According to CW [Hamilton] and GAL [Pruden] testimony and exhibits provided, it is clear that the same issues that led to removal of [J.P.] from Mother's home have not been remedied and both parents have demonstrated a lack of commitment toward [J.P.] by failing to support and have any contact with him for many months. Both parents have legally abandoning [sic] [J.P.]  Mother refused to participate with Agency and GAL investigations by refusing to allow the CW or GAL into her home and refusing to provide an address that [sic] she was living, thereby refusing to provide any information to show she is able to provide shelter and necessities for [J.P.'s] basic needs.

(Jgmt. Entry at 10.)

---

[5] In its motion for permanent custody, FCCS asserted that the factors in R.C. 2151.414(B)(1)(a), (b) and (d) applied to the case. Thus, we conclude the court's reference to R.C. 2151.414(B)(1)(c) was a typographical error. As relevant here, R.C. 2151.414(B)(1) provides: "Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply: (a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public services agencies * * * for twelve or more months of a consecutive twenty-two month-period, or has not been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two-months period if, as described in [R.C.] 2151.413(D)(1), the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents; (b) The child is abandoned; * * * and (d) The child has been in the temporary custody of one more public children services agencies * * * for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two-month period and, as described in [R.C.] 2151.413(D)(1), the child was previously in the temporary custody of an equivalent agency in another state."

[6] As relevant here, R.C. 2151.414(E) provides: "(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties; * * * (4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child; * * * (10) The parent has abandoned the child; * * * (14) The parent for any reason is unwilling to provide food, clothing, shelter and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect; * * * and (16) Any other factor the court considers relevant."

{¶ 63} Appellant does not challenge the juvenile court's analysis of the case under R.C. 2151.414(D)(2) and (B)(1) per se. Rather, appellant alleges that several of the juvenile court's factual findings are unsupported by the record and these factual inaccuracies render its judgment granting permanent custody of J.P. to FCCS against the manifest weight of the evidence.

{¶ 64} Appellant first contends the court erroneously stated that the GAL's report was admitted into evidence without objection when in fact, appellant's counsel objected to the report, and the court ultimately admitted the report "over objection." FCCS concedes error in this regard. However, appellant acknowledges that this error is "probably not determinative." (Appellant's Brief at 17.)

{¶ 65} Appellant also alleges that no testimony supports the court's finding that J.P. lost teeth due to the domestic violence incident that resulted in the filing of the complaint. Although the court mistakenly stated that Hamilton provided such testimony at the hearing, we note appellant's concession that Pruden testified that J.P. told her about his mother "punching him in the face." (Tr. at 65.) We further note that the information about J.P.'s loss of teeth was included in the complaint, and the juvenile court found J.P. to be neglected, abused, and dependent as a result of the information contained in the complaint. There was no appeal from this adjudication. In *In re I.A.C.A.*, 10th Dist. No. 14AP-638, 2015-Ohio-256, ¶ 17-18, this court rejected an argument that uncontested allegations in the complaint that formed the basis of a neglect and dependency finding cannot be considered by the juvenile court in a permanent custody adjudication.

{¶ 66} Appellant further maintains that no evidence supports the court's finding that appellant initially voluntarily placed J.P. with FCCS following the domestic violence incident in July 2020. FCCS acknowledges error in the court's statement. However, appellant concedes that Hamilton testified that J.P. was brought to FCCS for safekeeping because appellant had not made a suitable plan for J.P. following her arrest for domestic violence. The court's misstatement does not render its judgment against the manifest weight of the evidence.

{¶ 67} Appellant next contends that no evidence supports the court's finding that a home study was conducted for a "relative" in Tennessee, but no further steps were taken due to the relative no longer being interested in taking custody of J.P. Appellant maintains

that while the court was likely referring to J.A.P., he is not a "relative" insofar as DNA testing proved he was not J.P.'s father. (Appellant's Brief at 15.) Review of Hamilton's testimony confirms that the "relative" to which the court referred was likely J.A.P. Indeed, Hamilton stated that NYAP conducted a home study of J.A.P.'s home in Tennessee pursuant to the ICPC and that the home study occurred before J.A.P. was ruled out as J.P.'s biological father. Thus, the court's use of the descriptor "relative" was not inaccurate.

{¶ 68} Next, appellant takes issue with the court's assertions that appellant suffered in the past from OCD, PTSD, and anxiety, participated in counseling, and had previously been taken to the hospital for treatment of mental health issues. Appellant maintains that such details "were not brought out in the testimony." (Appellant's Brief at 16.) Appellant asserts that Hamilton "merely testified that mother had a prior involuntary stay at a hospital in Virginia" and "the GAL testified generally that mother had been previously admitted to [a] psychiatric hospital." (Appellant's Brief at 16.) While the court may have imprecisely set forth details about appellant's mental health history, the testimony provided by both Hamilton and Pruden demonstrates that appellant has long struggled with mental health issues, has not completed the mental health component of her case plan, and that her failure to do so creates ongoing concerns regarding returning J.P. to appellant's care.

{¶ 69} Finally, appellant asserts the court inaccurately stated Hamilton and Pruden testified that J.P. has special needs, including speech delays, and needed therapeutic behavioral services. Appellant maintains that Hamilton "actually testified that J.P. had no special needs" and that Pruden "merely testified that the child stutters when talking about the case and his parents." (Appellant's Brief at 16.) Hamilton's testimony regarding J.P. having no special needs was in response to a question about special needs as related to "physical disabilities, diagnoses or mental health issues." (Tr. at 48.) Further, the court's finding regarding therapeutic behavioral services arguably may be attributed to Hamilton's testimony that J.P. participates in mental health counseling as required by FCCS. Further, Pruden's testimony that J.P. is on an IEP at school and "stutters quite a bit when he starts to talk to me about the case and about his parents" arguably supports the court's findings that J.P. has special needs and speech delays. (Tr. at 68.)

{¶ 70} In the final analysis, although the juvenile court's judgment may contain certain factual inaccuracies, we conclude these factual inaccuracies, either individually or cumulatively, do not render the court's judgment against the manifest weight of the evidence.

{¶ 71} In sum, after careful review of the evidence and testimony presented at the hearing before the juvenile court, we find there was ample competent, credible evidence to support the court's conclusion that terminating appellant's parental rights and granting permanent custody to FCCS was in J.P.'s best interest. J.P. has been in the temporary custody of FCCS for an extended period of time—since July 2020. The evidence presented established that J.P. is not bonded with appellant and does not wish to reunify with her. J.P. has been in the care of his foster family since inception of the case, is bonded to them, and wants to continue living with them with the goal of adoption. The foster family is a potential adoptive home. The hearing on the motion for permanent custody was held more than three years after emergency care and temporary custody were first ordered, and still appellant has failed to comply with portions of the case plan and has not made sufficient, consistent effort to demonstrate she can provide physical, financial, psychological, and emotional stability for J.P. At the time of the hearing, appellant was in jail. She has not visited J.P. or otherwise had contact with him in two years. Under these circumstances, we cannot conclude the juvenile court clearly lost its way in determining it was in J.P.'s best interest to terminate appellant's parental rights and grant permanent custody to FCCS. Appellant's second assignment of error is overruled.

## IV. Conclusion

{¶ 72} Having overruled appellant's two assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.

*Judgment affirmed.*

JAMISON and BOGGS, JJ., concur.