[Cite as *In re D.W.D.-H*, 2024-Ohio-5593.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY

IN THE MATTER OF THE ADOPTION
OF D.W.D.-H.

:
:
:   C.A. No. 2023-CA-68
:
:   Trial Court Case No. 20225041
:
:   (Appeal from Common Pleas Court-
:   Probate Division)
:
:

. . . . . . . . . . .

O P I N I O N

Rendered on November 22, 2024

. . . . . . . . . . .

GREGORY K. LIND, Attorney for Appellant

ZACHARY S. BAYLESS, Attorney for Appellee

. . . . . . . . . . . .

HUFFMAN, J.

{¶ 1} Stepfather appeals from the trial court's decision and judgment entry denying his petition to adopt his minor stepchild. After reviewing the pertinent statutory factors in light of the evidence presented at an adoption hearing, the trial court held that adoption was not in the best interest of the child. Stepfather challenges the trial court's best-interest

determination. In two related assignments of error, he contends the trial court's resolution of the issue constituted an abuse of discretion and was against the weight of the evidence.

{¶ 2} We hold that the trial court abused its discretion in determining the best interest of the child and that its decision was against the manifest weight of the evidence. Accordingly, the judgment is reversed, and the matter is remanded for the trial court to enter an order granting Stepfather's petition for adoption.

## I. Background

{¶ 3} The child at issue was born in 2016 during a relationship between Father and the child's mother ("Mother"). The relationship ended in the summer of 2018. Mother subsequently obtained a civil-protection order against Father, and Father filed for legal custody of the child. Father's custody action was dismissed after he became incarcerated in connection with multiple protection-order violations.

{¶ 4} Stepfather married Mother in June 2021. One year and one day after their marriage, Stepfather petitioned to adopt the child. The petition alleged that Father's consent was unnecessary under R.C. 3107.07(A). Specifically, the petition alleged that Father had failed without justifiable cause to have more than de minimis contact with the child or to provide for the child's maintenance and support as required by law or a judicial decree for at least one year immediately preceding the petition's filing.

{¶ 5} The trial court held a multi-day hearing on Stepfather's petition in December 2022 and January 2023. The hearing addressed the need for Father's consent and whether adoption was in the child's best interest. Witnesses included Father, Mother, Stepfather, Father's own mother, and Father's adult daughter. Based on the evidence

presented, the trial court found that Father had failed to have contact with or to provide maintenance and support for his child during the one-year period of June 17, 2021 to June 17, 2022. However, the trial court found justifiable cause for Father's failure to contact or provide for his child due to his incarceration throughout that year. Therefore, the trial court found that Father's consent to the adoption was necessary. Father did not consent. As such, in January 2023, the trial court denied Stepfather's petition without considering whether adoption was in the child's best interest.

{¶ 6} This court reversed the trial court's judgment in *In re Adoption of D.W.D.-H.*, 2023-Ohio-1999 (2d Dist.). We concluded that the trial court's justifiable-cause determination regarding Father's failure to provide maintenance and support for his child was against the manifest weight of the evidence. *Id.* at ¶ 35. Based on that determination, we had no occasion to review the trial court's finding that Father had justifiable cause for failing to have contact with the child. Given Father's unjustifiable failure to provide maintenance and support during the applicable one-year period, we found his consent to the adoption was not required. *Id.* at ¶ 36. We remanded the case for the trial court to determine whether allowing Stepfather to adopt would be in the child's best interest. *Id.* at ¶ 40.

{¶ 7} On remand, the trial court heard two additional days of testimony related to the child's best interest. Witnesses included Stepfather, the child's elementary-school teacher, the child's baseball coach, Mother, one of Father's landlords, two of Father's friends, Father's adult daughter, and Father himself. Taking into consideration this additional testimony, the trial court examined the statutory factors governing best-interest

determinations in contested adoption cases. On December 1, 2023, the trial court concluded that the best interest of the child warranted denying Stepfather's petition. Stepfather timely appealed, raising two assignments of error.

## II. Analysis

**{¶ 8}** Stepfather's assignments of error state:

The trial court abused its discretion by not finding that it was in the best interest for the adoption of D.W.D.-H. by the Appellant.

It was against the manifest weight of the evidence that the Probate Court failed to find that it was in the best interest of the child to be adopted by Appellant/Stepfather.

**{¶ 9}** In these related assignments of error, Stepfather challenges the trial court's best-interest determination as being an abuse of discretion and against the manifest weight of the evidence. He contends the trial court erred in finding adoption not to be in the child's best interest despite opining that all 11 statutory factors in R.C. 3107.161(B), to the extent that they were relevant, "present[ed] a favorable review of the Petition," and he argues that the trial court considered a factor not relevant to the best interest of a child, that being Father's desire to establish a relationship with the child.

**{¶ 10}** This court applies abuse-of-discretion review in adoption cases. As we explained not long ago:

. . . "Since the facts in each case will vary, and the advisability of permitting an adoption must be made on a case-by-case basis, the trial

court must be allowed broad discretion in making the determination." *In re Adoption of Charles B.*, 50 Ohio St.3d 88, 94, 552 N.E.2d 884 (1990). Therefore, we review a probate court's decision to grant or deny an adoption petition under an abuse of discretion standard. A trial court abuses its discretion when its decision is "unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

*In re Adoption of J.A.M.*, 2022-Ohio-2313, ¶ 8, (2d Dist.).

{¶ 11} While applying abuse-of-discretion review, appellate courts in adoption cases "may not substitute [their] judgment for that of the probate court when competent, credible evidence supports the probate court's decision." *In re Adoption of M.R.P.*, 2022-Ohio-1631, ¶ 20 (12th Dist.); *In re Adoption of K.M.T.*, 2019-Ohio-4988, ¶ 29 (5th Dist.). With regard to the best-interest analysis, "[i]ssues of credibility are for the trial court to determine because the trial judge is in the best position to view the witnesses and to observe the demeanor, gestures and voice inflection during testimony." *In re Adoption of A.M.L.*, 2015-Ohio-2224, ¶ 11 (12th Dist.).

{¶ 12} Here, the trial court examined each of the statutory factors governing best-interest determinations. Those considerations include:

(1) The least detrimental available alternative for safeguarding the child's growth and development;

(2) The age and health of the child at the time the best interest determination is made and, if applicable, at the time the child was removed from the home;

(3) The wishes of the child in any case in which the child's age and maturity

makes this feasible;

(4) The duration of the separation of the child from a parent;

(5) Whether the child will be able to enter into a more stable and permanent family relationship, taking into account the conditions of the child's current placement, the likelihood of future placements, and the results of prior placements;

(6) The likelihood of safe reunification with a parent within a reasonable period of time;

(7) The importance of providing permanency, stability, and continuity of relationships for the child;

(8) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;

(9) The child's adjustment to the child's current home, school, and community;

(10) The mental and physical health of all persons involved in the situation;

(11) Whether any person involved in the situation has been convicted of, pleaded guilty to, or accused of any criminal offense involving any act that resulted in a child being abused or neglected . . .

**{¶ 13}** With the foregoing considerations in mind, the trial court found that the child, who was seven and a half years old at the time of the hearing, was thriving in the care of Mother and Stepfather. The trial court specifically found that Stepfather was a good

provider and that he treated the child well. The trial court opined that Father's own environment was much less stable and that he had lived several places during the preceding year. The trial court noted that the best alternative was for the child to "remain in the custody" of Mother. Although the trial court made this finding, we note that a change in custody was not implicated by Stepfather's adoption petition.

{¶ 14} With regard to the child's wishes, the trial court found, based on an in camera interview, that the child was communicative, relaxed, and did not appear to have been coached. The trial court noted that the child considered Stepfather to be his "dad." The child recognized pictures of Father "but did not specifically understand his relationship" with Father. Nevertheless, the child stated that Father "was nice" and expressed a desire to visit Father again. As we discuss below, however, the trial court's characterization of the in camera interview is inconsistent with the record of that interview.

{¶ 15} Concerning some of the other factors, the trial court observed that it had been five years since the child had resided with both Father and Mother. Moreover, the child's existing relationship with Stepfather and Mother had been stable and in place for about three years. The trial court noted that it foresaw no circumstances under which it would order any other custodial arrangement. Based on testimony and photographs from Father, however, the trial court found that Father and the child previously had enjoyed a "close and loving relationship." The trial court envisioned Father and the child spending time together in the future "if the parties worked toward that end."

{¶ 16} The trial court characterized the child's living arrangement with Stepfather and Mother as "permanent and stable." It then added: "Clearly the child had a good

relationship with his biological father for a number of years. While that relationship has been interrupted, the Court believes that this relationship could be rekindled with the support of the parties." The trial court questioned the potential negative long-term effect on the child if it completely removed Father from the child's life. The trial court found that Father wanted to be in the child's life, and it saw no evidence that Father and the child could not once again have a loving and positive relationship. The trial court then queried:

> . . . What would be better for the child? Having a biological father who has love for the child—albeit through a noncustodial/visitation arrangement? Or, on the other hand, having a biological father who has no contact with the child? While this court has no jurisdiction over juveniles, it has plenty of experience with children suffering from attachment disorders as a result of feeling abandonment from their biological parents.

{¶ 17} With regard to Father's own circumstances, the trial court acknowledged that he "has had a colorful life highlighted by his alcoholism, driving convictions, embittered relationship with the child's mother, and instability." The trial court noted that Father's situation "culminated in a prison sentence for nearly sixteen months." After reiterating that the child should remain in the custody and care of Mother and Stepfather, the trial court found that Father had "taken steps to improve himself." The trial court saw no evidence that Father still was drinking alcohol at the time of the most recent hearing. It also cited evidence that Father had become a "good father" to his adult daughter. It noted the absence of any domestic-violence convictions or offenses involving neglect or abuse of the child.

{¶ 18} Ultimately, the trial court opined that the 11 best-interest factors in R.C. 3107.161(B) "present[ed] a favorable review" of Stepfather's adoption petition. It nevertheless found that other considerations militated against granting the petition. Given the importance of this portion of the trial court's analysis, we have elected to quote it in full as follows:

The Court considers one other [consideration] to be a significant factor. The Court received a great deal of testimony about the parties' turbulent relationship in 2018; but this Court finds there is more to this story. After observing the demeanor of the parties and hearing the testimony herein, the Court finds that [Father] has consistently sought to visit and/or have custody of his son. He filed two actions for custody in the Clark County Common Pleas Court. He has fought the pending Petition for adoption of his son for the past sixteen months.

[Mother] painted a picture of [Father] as a volatile and violent figure in this tug of war—testifying about [Father's] social media outbursts and violations of the civil protection order. First, this Court finds it incongruent that she would continue to monitor [Father's] social media. Moreover, this Court finds these "outbursts"—e.g. "Mad Dad is on his way"—not to be threats so much as they are, rather, statements consistent with a father who is passionate about seeing his child and fighting for his child.

Two of the mother's police reports seeking punishment for [Father's] violations of the civil protection order were tied directly to the father's

attempts to see the child. Specifically, on September 25, 2018, the mother filed a police report because she was part of a "group" text from [Father] who indicated that he was upset because he could not have visitation with his son. She filed a police report despite the fact she had already blocked [Father's] calls and messages from her phone and that she had not even received this particular text message. And on October 15, 2018 the child's mother filed a police report because [Father's adult daughter] asked her if [Father] could take the child to the zoo.

To be sure, [Father] has to accept some of the blame for his current predicament and his inability to see his child. The Court, for instance, received no evidence that anyone forced [Father] to drive while under the influence of alcohol. That having been said, it is also clear to this Court that [Mother] has enjoyed the upper hand in dictating the terms of [Father's] relationship with the child; and she has availed herself of that position. Her hands are not completely clean with respect to her turbulent relationship with [Father]. She alleges [Father] threatened to damage a vehicle and other personal property; yet the Court received testimony that she, herself, had damaged the vehicle. She secured a civil protection order against [Father], as described above, but then filed what might be described as trivial complaint police reports as a result of [Father's] attempts to see his child. The Court was given the opportunity to view a video which [Mother] had taken on her phone showing [Father] holding a knife by one of the

vehicles. The Court was struck that instead of calming the situation at that moment down, [Mother] was taunting [Father] into some sort of action which she then might capture on her cell phone camera. And, finally, this Court notes that the attempts of the child's paternal grandmother and half-sister to visit with the child were thwarted.

It is this Court's experience that, most of the time when there has been a lengthy period of time wherein a parent has not had contact with a child, the Court finds that that parent took no steps to seek visitation. That is not the case here. To the contrary, it appears that [Father] passionately took every legal step available to him to secure his rights to see his child. Half the time his efforts were thwarted by his own misconduct. But the other half it was by the actions of the child's mother. He could only see his child at the whim of the child's mother; but the mother had legally blocked him from contacting her—and had punished him without reluctance when he did. The task at hand is to consider the best interests of the child; and ultimately whether the parental rights of [Father] should be terminated and the adoption petition granted. The majority of the case presented to this Court was about the child's biological parents' inability to get along with each other. There has been very little evidence to suggest that [Father] has not been a loving father to this child.

The Court believes that [Father] deserves the opportunity to reestablish his relationship with his child. The Court believes that it is in the

best interests of the child to have that relationship reestablished.

Make no mistake. [Father] has not made a case that he should have custody of this child. But he has convinced the Court that—under the present circumstances—he should be in this child's life. The Court sees no problem with an arrangement which permits the Stepfather to continue to be the loving stepfather of this child while also permitting [Father] the chance to be a loving biological father to this child. The child will benefit from such an arrangement.

The only parties to be challenged will be [Father] and [Mother], as they are forced to work with each other to raise this child. That, however, is their problem. Not the child's. For the foregoing reasons, the Court now finds it to be in the best interests of the child to deny the Petition for the child's adoption.

(Footnote omitted.)   December 1, 2023 Decision and Judgment Entry at p. 7-10

{¶ 19} The trial court correctly recognized that its analysis was not confined to the explicit R.C. 3107.161 factors, as those considerations are non-exclusive, but it focused on Father's interest in rekindling a relationship with the child, rather than on the best interest of the child.   "In making [a] final decision, every pertinent best interest factor must be weighed, non-listed factors can be relevant, and no one factor is dispositive."   *In re Adoption of P.M.K.,* 2024-Ohio-1770, ¶ 28 (7th Dist.).   The trial court's primary consideration must be the best interest of the child.   *In re Adoption of Charles B.*, 50 Ohio St.3d 88, 94 (1990).   A court's failure to base its decision on a consideration of the best

interest of the child involved constitutes an abuse of discretion. *In re Adoption of Ridenour,* 61 Ohio St.3d 319 (1991).

{¶ 20} While a trial court may applaud a biological father's efforts to improve his life and his desire to repair his role as a parent, it cannot ignore the statutory factors associated with a child's best interest, as "the goal of adoption in Ohio 'is to protect the best interest of the child.' " *In re Adoption of J.G.S.*, 2023-Ohio-1155, ¶ 19 (1st Dist.), quoting *In re Hitchcock*, 120 Ohio App.3d 88, 104 (8th Dist. 1996), citing *In re Adoption of Zschach*, 75 Ohio St.3d 648 (1996). "[T]he statutory framework and case law both elevate the best interest of the child over the rights of others in an adoption proceeding." *Id.*, citing *Adoption of Ridenour* at 322. The best interest of the child is of primary concern, with "*all* other concerns of secondary importance." (Emphasis in original.) *Pater v. Pater,* 63 Ohio St.3d 393, 403 (1992). The focus of a best interest determination is the child, not the parent's interests. *In re R.G.,* 2016-Ohio-7897, ¶ 28 (8th Dist.). In reaching its decision on the evaluation of the best interest of the child, the final step in considering a petition for adoption, the trial court considered all 11 enumerated statutory best interest factors and concluded, after a lengthy discussion of each factor, that "[t]hese eleven factors present a favorable review of the Petition." The court went on, though, to consider one other "significant" factor in discerning the child's best interest, and it concluded that, because Father had consistently sought visitation with and/or custody of the child and had "fought" the petition, "(t)he Court believes that [Father] deserves the opportunity to reestablish his relationship with his child. The Court believes that it is in the best interest of the child to have that relationship reestablished." In focusing on what

Father "deserved" rather than on the best interest of the child, the trial court strayed from its role and abused its discretion.

{¶ 21} While a court may consider other relevant non-enumerated factors when making its best interest calculation, these other factors must relate to the best interest of the child. A best interest determination must focus on the child, not the parent. *Miller v. Miller*, 37 Ohio St.3d 71, 75 (1988); *In re Awkal,* 95 Ohio App.3d 309, 315 (1994). Concentrating on whether the biological father sought visitation or custody in no way focuses on the best interest of the child. Rather, in doing so, the trial court improperly emphasized the desires of the biological father rather than the best interest of the child. *See, e.g., Adoption of Ridenour*, 61 Ohio St.3d. at 322 ("[T]he trial judge does not appear to have considered the children's best interests in issuing the denials. In fact, it seems that in denying the adoptions, the judge elevated the rights of the grandparents over the best interests of the children."); *Adoption of J.G.S.* at ¶ 19 ("While the magistrate acknowledged Father's progress, desires, and emphasis on his familial history, she properly centered J.G.S.'s welfare in her best-interest analysis.").

{¶ 22} Unlike cases in which the court found that a significant bond existed between the parent opposing the adoption and the child at the time of the best interest determination, thereby rendering it in the best interest of the child that the adoption not take place, no such bond existed here. *See, e.g, In re Adoption of P.M.K.,* 2024-Ohio-1770 (7th Dist.) (The trial court found that, although grandmother had obtained custody of the child and the child was doing very well with grandmother, the 11-year-old child spent time with her mother, called her "mom," and was very attached to her maternal half-

brother; mother also attended some of the child's activities and most of her visitations. Under these circumstances, the trial court determined that granting the adoption petition (thereby "sever[ing] the child's parental relationship" with mother) was not in the child's best interest).

{¶ 23} An adoption "does not contravene the best interests of the child simply because an even stronger set of family bonds might be desirable." *In re Matter of Taylor,* 2002-Ohio-2755 (8th Dist.). Neither a biological relationship nor a positive familial relationship can be controlling in itself when determining the best interest of a child. *See In re J.B.,* 2013-Ohio-1704 (8th Dist.) ¶ 111. In other words, a child's present best interest is not tied to one parent's desire to forge a relationship in the future in the absence of a present relationship.

{¶ 24} Thus, the proper focus of the decision was the best interest of the child, and not whether Father had pursued a relationship with the child. In abandoning the best interest of the child and instead focusing its ultimate decision on Father's desire to have a future relationship with the child despite his past actions, the trial court abused its discretion. Although Father had made some relatively modest progress in that he had not recently been arrested or jailed, those recent circumstances had to be viewed in light of his background and past actions, particularly since Father, through his own actions, has had no relationship with the child since 2020. *See In re N.B. and A.B.,* 2015-Ohio-314, ¶ 62 (8th Dist.).

{¶ 25} In finding that the best interest of the child would be served by denying the petition, the trial court simply ignored its factual findings related to the enumerated

statutory factors and emphasized Father's desire to establish a relationship with the child. The trial court acknowledged that Father's circumstances were much less stable than Mother's. Father's lack of contact with the child since a young age was of his own making. Mother and Father ended their relationship in 2018, and the child had not lived with him since then. Father filed an action for visitation in 2018, and three guardian ad litem reports recommended limited supervised visitation between Father and the child while expressing great concern for Father's behavior and living conditions. Also in 2018, as a result of his actions, Father was sentenced to a jail term of 180 days (with 90 days suspended) for several criminal cases, each involving a violation of a protection order. Father's 2018 custody action was eventually dismissed because he failed to pursue it as a result of his incarceration, although he continued to have visitation at a supervised visitation center and then with his mother. Father attended a total of 11 supervised visits pursuant to the court-mandate, the last of which occurred on June 25, 2019.

{¶ 26} With the pandemic, Mother arranged for Father to have virtual visits with the child. However, Father stopped attempting to visit, even virtually, in November 2020. And while the trial court concluded that Father had become a "good father" to his now adult daughter, suggesting that his current relationship with an adult daughter somehow foreshadowed a potential relationship with the child involved in this case, we note that his daughter was in the custody of her paternal grandmother from the age of two until she reached majority.

{¶ 27} In 2019, Father pled guilty to a violation of a protection order, a felony of the fifth degree, in Clark C.P. No. 19CR229, and he was sentenced to community control

sanctions. In 2021, Father pled guilty in Clark C.P. No. 20CR490 to a felony operating a vehicle under the influence offense (OVI), a felony of the third degree. His guilty plea and his admission that he drank alcohol were violations of the community control sanctions imposed in the protection order case. The court sentenced Father to 18 months in prison for the OVI, found that Father had violated the terms and conditions of his community control sanctions, and sentenced him to 12 months in prison for the protection order violation (with 180 days of jail time credit), to be served consecutively. Stepfather's petition for adoption was filed prior to Father's release from prison.

{¶ 28} Father has exhibited a consistent pattern of engaging in impaired driving, having been convicted of the offense at least eight times. Father acknowledged that he does not have a valid driver's license, yet admitted that he continues to drive. Father claimed to have driving privileges that permit him to drive 24 hours a day for work purposes, but he failed to provide the court with any verification of those privileges. Father also proudly acknowledged that he had no fear of being arrested for driving under suspension, as he believed the police would simply order him to park his car and not drive. During his testimony, Father failed to appreciate or acknowledge that driving under suspension is a misdemeanor of the first degree. Father testified that he did not believe driving without a license would endanger the child in any way. Father is also on the registry of habitual impaired drivers with the Ohio Department of Public Safety.

{¶ 29} Father acknowledged during his testimony that he had not financially provided for the child since at least 2020, yet he claimed that he had $50,000 in the bank at the time of trial to provide support. Father's claims tested the limits of credulity. In

its evaluation of the best interest of the child, the trial court gave no consideration to Father's admission that he had not provided any support of any nature for the child for many years, despite his claims of substantial current assets.

{¶ 30} Father's behavior over the course of the child's lifetime demonstrated a consistent exercise of poor judgment. In its final assessment of the best interest of the child, the trial court chose to overlook Father's past conduct and focus solely on Father's desire to establish a future relationship with the child. The trial court also ignored Father's guilty pleas to three separate charges of violation of a protection order in which Mother was the protected person. Instead, the trial court focused on Mother's role in notifying the police of Father's communication with her in each instance. Mother had a valid protection order issued by a judge, which she had the right to enforce. Mother obtained the protection order before Father filed a proceeding to determine custody. Father repeatedly, over the course of the child's life, engaged in aggressive, even violent, behavior and used profane names directed at Mother in the child's presence. For instance, Father acknowledged destroying a refrigerator used in the home where the child lived and the child's fish tank; he justified his conduct simply by pointing out that he had purchased the items. In a video admitted into evidence, Father can be seen standing by Mother's vehicle with a large hunting knife in his hand, threatening to slash the tires, and rationalizing his right to do so because he purchased the tires. Father was previously trespassed from Mother's place of employment and acknowledged that he alleged to her employer that she was a sex offender, which caused Mother to have to meet with the superintendent of the school district where she was employed and explain the

circumstances.

{¶ 31} Father also used social media to air his grievances against Mother and Stepfather, conduct that he argues was innocent. However, when viewed together and in light of his past conduct, this behavior appears to have been intimidating and threatening toward Mother and Stepfather. For instance, prior to his release from the half-way house following his 2022 imprisonment, Father posted, "Think real hard about what you are doing! Dad's coming home!" Certain exhibits admitted at trial demonstrated Father's abusive, profanity-laced rants directed toward Mother and Stepfather. In one video-recorded call, Father threatened to drive his truck through her house – stating "there won't be a house anymore" -- and to kill anyone who she dated. He used profane names directed at Mother and threatened to slash Stepfather's tires. When Mother asked "what happens when I move him in?" Father responded, "He ain't gonna be alive."

{¶ 32} While dismissing the significance of Father's prolific use of social media, the trial court instead criticized Mother for continuing to monitor Father's statements on social media. Mother and Stepfather have good cause to be concerned about Father's public statements, particularly in light of his statements that impact the child. However, Mother and Stepfather have not responded in any manner to Father's social media posts, including his statements that "I know my son is gonna hate his mother and this piece of oversized work that wants to try and take me out. My son is gonna know everything and then what!?!" Father also posted a statement to social media about "broadcasting to the world. Mad dad is coming." In another post directed to Stepfather, Father stated "Matt, Matt, Matt, you poor idiot. I'm going to give you the benefit of the doubt. I already know

this isn't you doing this. I also know you are a fucking dumbass." In another post, also directed toward Stepfather, Father stated, "What type of low-key lowlife tries to interfere with a dad and his child? I'm about to expose you, fat ass." Father has made negative remarks about Stepfather on social media, to which Stepfather has not responded. In August 2018, Father demanded to see the child and used profane names to describe Mother. His demeaning and profane comments have not been limited to Stepfather and Mother. He directed crude language toward the guardian ad litem in the custody case in a social media post and concluded that the court system could "f…. off" in the same post. While Father was in jail in 2018 for violation of a protection order, he had his daughter post a photo on his Facebook page showing him in his jail uniform in the attorney visitor's booth at the Clark County Jail. In 2022, he posted to social media that he would be a millionaire "if it weren't for alcohol and vaginas." He also posted a picture of the Notice of Hearing on Petition for Adoption. Despite the guardian ad litem's report that Father's Facebook posts were embarrassing to the child, Father disagreed.

**{¶ 33}** Father acknowledged that he had not made any effort to communicate with Mother within the bounds of the protection order. During his testimony, Father admitted stating in various settings that he hoped that the child grew to hate Mother. Father also acknowledged in the trial court that he had not removed any disparaging or threatening social media posts directed toward Mother and Stepfather and suggested that he would only destroy or remove the information if he prevailed in thwarting the adoption petition.

**{¶ 34}** In focusing on Father's efforts, the trial court emphasized that Father had completed alcohol treatment at McKinley Hall but failed to acknowledge that Father had

been arrested and pled guilty to another OVI offense *after* completing that treatment. At trial, Father described his treatment at McKinley Hall as "a joke," causing concern for his commitment to sobriety. Father did not believe he had a problem with alcohol, despite his record of impaired driving. In a guardian ad litem report from October 2018, it was recommended that Father refrain from using alcohol and drugs of abuse, yet Father admitted at the hearing to using cannabis daily. He claimed to possess a medical marijuana card but failed to provide one to the court.

{¶ 35} Before the trial court, Father admitted that he was aggressive and violent in 2016 but rationalized his behavior because he "was drunk." He was also involuntarily admitted to the hospital in 2016 for mental health issues. He admitted telling Mother in 2017 that he was suicidal. He admitted carving into the hood of a Jeep when he was angry in 2018 and entered counseling in October 2018 for depression and anger management.

{¶ 36} The trial court also placed emphasis on the fact that Father had no convictions for domestic violence or for any offense concerning the neglect or abuse of a child. However, his criminal record was long and varied. Father had a criminal record spanning 25 years in at least four counties in Ohio and had an outstanding warrant in Franklin County. It was Father's criminal conduct that caused the disruption in his relationship with the child. Additionally, Father's admission by way of his guilty pleas to at least three separate violations of a protection order in which Mother was the protected person undoubtedly impacted the child.

{¶ 37} The trial court also placed undue weight on its in camera interview of the

child who, at the time of the interview, was seven years old and in the first grade. When asked about his family, the child responded by identifying Stepfather as his "dad" and identifying Mother, his young sister, his aunt, and his grandparents as members of his family. The judge then showed the child three pictures of Father and asked if he knew who the individual was; each time the child responded that he did not know the identity of the person in the photograph. After prompting from the court, the child finally responded that the person in the picture looked familiar and that he "used to visit his house." The only recollection that the child had was that the man in the picture had a lizard to which the child fed bugs. Despite the child's vague memory of having visited Father's home in the past, he could not identify his relationship with Father. The court acknowledged in its decision that the child did not know his relationship to Father, but the court relied solely on Father's interest in reestablishing a relationship with the child, rather than the child's current and recent past relationship with Father, in determining best interest. Pursuant to a report in the record, the child had limited verbal comprehension and expression skills; in light of this, the trial court placed undue emphasis on its in camera interview with the child in reaching its conclusion that granting the petition was not in the best interest of the child. The trial court fashioned its own vision of Father's interests as paramount to all other best interest factors, when Father's interests or desires were not relevant to the child's best interest and the child did not know who Father was or his relationship to him. The emphasis must be on the child's relationship with a parent, not a parent's desire to build a future relationship.

**{¶ 38}** While the trial court hypothesized that the child would be harmed if his

relationship with Father was terminated, there was no evidence to support that view. Instead, the trial court relied on its own beliefs regarding the termination of a parent's relationship with a child, rather than on evidence supporting the argument in this case.

**{¶ 39}** Thus, in abandoning the focus on the best interest of the child and instead focusing on Father's interest in building a relationship with the child in the future, the trial court abused its discretion in finding that the adoption was not in the best interest of the child.

**{¶ 40}** For the reasons set forth above, the trial court erred in determining that the adoption was not in the best interest of the child, and the denial of the petition was against the manifest weight of the evidence. Accordingly, Stepfather's two assignments of error are sustained.

### III. Conclusion

**{¶ 41}** The judgment of the Clark County Common Pleas Court, Probate Division, is reversed, and the matter is remanded to the trial court for it to issue an order granting Stepfather's petition for adoption.

. . . . . . . . . . . . .

WELBAUM, J., and TUCKER, J., concur.